JONES, Senior Judge,
delivered the opinion of the court:
This is a suit for disability retirement pay. Plaintiff, a former lieutenant in the Army Air Corps who was demobilized in July 1945, contends that he was permanently incapacitated for active service at the time of that release. The main thrust of his cause of action is that a 1959 decision to the contrary by the Air Force Board for the Correction of Military Records was arbitrary in fact and unsupported by substantial evidence.
Plaintiff asserts as the basis of his claim for retirement two disabilities, both equally the enduring result of a 1943 service-connected head injury: (1) certain damage to the muscles and nerves associated with his right eye, resulting principally in a condition known as diplopia, or double vision, in which both eyes fail to focus simultaneously in the same direction, thereby producing blurred, double images; and (2) chronic brain damage, described variously as “chronic brain syndrome associated with head trauma,” with grand mal, and as “encephalopathy due to head trauma,” with grand mal (resulting in such symptoms as nausea, an inability to concentrate, seizures and blackout spells, and considerable personality changes). The former was clearly diagnosed as early as several weeks after the 1943 head injury. The latter disability, however, was never diagnosed before plaintiff’s release from service; and while certain behavior was observed by 1950 which gave rise in the mind of plaintiff’s physician to suspicion of brain damage, no *309 such actual diagnosis was made until 1955, 10 years after plaintiff’s release, when for the first time a complete neurological examination (including electroencephalograms) was administered.
It is with plaintiff’s wartime injury that the story begins. Plaintiff had been serving in the Pacific Theater for 5 months as a bombardier, his military occupational specialty (MOS). He was stationed in New Guinea when the accident occurred in mid-September 1943'. He was riding near his base in a jeep with his superior officer behind the wheel when that vehicle collided headon with an Army truck, hurling him forward and causing his forehead to strike the windshield violently. The diagnosis rendered in the first hours after the accident revealed that he had suffered, inter alia, major and minor lacerations both above the right eye (closing that eye) and on the scalp, a mild cerebral concussion, and a broken nose. The condition of double vision first became apparent a week later when the bandages were removed from his head and face. It was that condition which was responsible for his extended hospitalizations in the Pacific Theater from early October to the end of 1943 and, following his transfer home as recommended by a Disposition Board, from January to August 1944.
Plaintiff appeared before three Disposition Boards in the period between his 1943 accident and his 1945 release, the first in Australia and the last two in the States. The first Board, in recommending in October 1943 his return to the United States for further observation, treatment, and disposition, concluded that he was physically unfit for military service in the Pacific Theater by reason of diplopia (double vision) caused by the jeep accident.
The second Board, which in July 1944 considered plaintiff’s condition after he had been stateside 7 months, concluded that he had received maximum benefit from hospitalization. He was assigned to temporary limited duty, with a re-examination and re-evaluation to be made at the end of 6 months. During this period he at first supervised the collection of trash, then later attended classes in personnel affairs.
*310 The third Disposition Board, reviewing plaintiff’s condition in February 1945 at the end of the 6 months, assigned him to a second 6 months of limited service (directing that he was to be given no responsibilities requiring a substantial amount of close work). At the end of this period he was to be re-examined and re-evaluated once again.
The re-examination, re-evaluation (and presumably the definitive disposition concerning plaintiff’s permanent status which had been, in effect, postponed to permit observation for the two 6-month periods) which the third and last Disposition Board envisioned never took place, however; for before the second 6-month period had elapsed he was demobilized, effective July 1945. This release followed a routine physical examination,[1] the report on which contains the statement that plaintiff was not permanently incapacitated for general service — this despite the fact that he was assigned to only limited and not general service at the time.
Virtually from the date of his release from service plaintiff has experienced numerous and serious physical impediments to ordinary living. His double vision continued, becoming especially aggravated when he was tired and rendering both reading and night driving exceedingly difficult tasks. Additionally, he suffered as early as 1944 from recurrent headaches and nausea and as early as mid-1945 from acute nervousness, dizzy spells, and occasional seizures or blackouts.
Examined in October 1945 by Dr. W. O. Smith, a highly accredited eye, ear, nose, and throat specialist, plaintiff was found to have an extreme imbalance of the eye muscles. Dr. Smith testified that plaintiff’s double vision was then so severe that he considered him to be totally disabled, unable at that time to do any physical or mental work.
Dr. O. B. McCoy, a general practitioner who treated him for several years beginning in late 1949, observed that plaintiff was suffering frequent severe headaches, blackout spells, loss of temper, periodic desire for solitude and avoidance of people, loss of ability to concentrate, and depression. Dr. McCoy, who had served as an Air Force flight surgeon during *311 the war, testified that he did not believe that plaintiff could have been fit at the time of his release for general or any save the most limited service.
Plaintiff was admitted to a Veterans Administration hospital in 1955 with complaints of headaches, blurring and double vision, and blackout spells. The record of this hospitalization states that “the patient does have a convulsive disorder which is secondary to a traumatic brain syndrome due to traumatic gross force, received as the result of a jeep accident while in military service in New Guinea in 1943.” On the basis of a final diagnosis of “chronic brain syndrome associated with brain trauma,” with grand mal, the Veterans Administration assigned plaintiff a 30 percent disability rating.
Plaintiff’s condition has continued since his 1955 hospitalization much the same as before. He continues to suffer spells, for example, in which he does not seem to see or hear and which are followed by confusion, headaches, and occasional falls. Two subsequent Veterans Administration hospitalizations in 1957 and 1959, each for a month or more, have confirmed the 1955 diagnosis; for after each one plaintiff was discharged with a diagnosis of encephalopathy due to head trauma, with grand mal.
Plaintiff first took his claim to the Correction Board in 1956, but his application was denied unless and until additional material evidence was presented. With his submission of an additional statement (by Dr. Smith), he sought reconsideration in 1959. The Board, however, denied reconsideration in December of that year, concluding that plaintiff had not been permanently incapacitated for active service at the time of his release.
The issue before us is whether this conclusion was supported by substantial evidence.
We hold that it was not.
The question which confronted the Board — and which confronts us now as we review the Board’s response to it, mindful as we are that that response would stand undisturbed unless wanting in the support of substantial evidence — is whether at the time of his separation from the military this plaintiff was permanently incapacitated for *312 active service.[2] Basically a question of fact, this was answerable only after an examination of the facts concerning plaintiff’s disabilities; i.e., concerning (1) their severity, and (2) their permanence. It was in reality two questions, related but separate: first, whether plaintiff’s physical disabilities in July 1945 were sufficiently severe — putting aside for the moment consideration of their duration — to incapacitate him for active service; and second, whether that incapacity was permanent. We shall treat these questions successively.
Essential at the outset is an understanding of the term “incapacitated for active service.” Perhaps the most instructive of the several explanations which appear in the military regulations is set forth in Par. 60a (2) of War Department Technical Manual TM 12-245, 1 October 1945[3] (a comprehensive code titled Physical Reclassification, Retirement, and Retirement Benefits For Officers), which states:
* * * an officer is permanently incapacitated for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent a finding that he is incapacitated for active service. With respect to such an officer actwe service means general service. * * * officers may be found capable of performing active (general) service even though they have diseases, injuries, or infirmities which would disqualify them for original appointment, provided such diseases, injuries or infirmities are of such a nature and degree as not to affect adversely the per *313 formance of active (general) service {including oversea, duty) considering the individual’s age, grade, branch and military occupational specialty. [Emphasis added.]
An officer is incapacitated for active service, therefore, when he is incapable of performing “full military duty, field as well as garrison,” “including oversea duty.” This means no less than general service. Weiner v. United States, 148 Ct. Cl. 445 (1960).
There can be no doubt, once this is understood, that plaintiff’s disabilities then recognized and diagnosed (i.e., quite apart from the condition of brain damage, which was not diagnosed until 10 years after his release) were severe enough to render him incapacitated for active service. Three Disposition Boards reviewed his condition, each one of them reaching what amounts to that conclusion. The first Board determined that he was unfit for overseas duty (in the Pacific Theater), and the last two determined explicitly that he was fit for only limited and not general service. The third and last Board was no more than several months before his release, and there is no suggestion in the record that any change occurred in his condition in that brief time.
To be sure, such incapacity alone will not authorize retirement for disability; there must, in addition, be present the element of permanence. That element was present here, for we conclude that the evidence before the Correction Board and the evidence before us now will support no other conclusion than that those disabilities recognized and diagnosed before plaintiff’s release were of such a lasting character.
Nearly 2 years had passed since the jeep accident when plaintiff was separated from the service, and yet his ocular condition persisted — fluctuating in intensity, apparently improving for a time, then deteriorating. The examination performed in October 1945 by Dr. Smith, for example, revealed the maximum outward eye deviation which the specialist’s apparatus was capable of measuring, a condition so severe that he considered plaintiff totally disabled. These visual difficulties continued, although gradually he made a partial adjustment to double vision. Ten years after his release from service the complaint persisted.
*314 Thus far we have spoken of plaintiff’s ocular injuries, which, were diagnosed as early as October 1943 and by reason of which he was three times determined to be unfit for general service. Serious and disabling as they were, however, the more serious condition resulted from his brain damage. There can be little doubt that this damage had likewise been sustained in the 1943 jeep accident. The 1955 Veterans Administration medical record, quoted above at length, notes that this condition was due to injuries “received as the result of jeep accident while in military service in 1943.” The Veterans Administration diagnoses made on the occasion of each of his three prolonged hospitalizations describe the condition as due to “head trauma.” The record contains no suggestion of any other possible cause. Most important of all, there is clear evidence of the symptoms of brain damage after the accident, at the time of, and shortly after, plaintiff’s release. Nausea, most frequently on arising, and recurrent headaches were recorded well before July 1945. Dizzy spells, occasional blackouts, and extraordinary nervousness and personality change were observed at that time. It is now apparent that many symptoms caused by this brain damage were then and for some time thereafter assumed to be related to the ocular injuries; e.g., the recurrent severe headaches while still in service, and the acutely nervous state which Dr. Smith attributed to loss of stereoptic vision. That doubtless is responsible in great part for the fact that at no time while in service nor indeed until 1955 did plaintiff receive a thorough neurological examination. When for the first time he did receive such an examination (including electroencephalograms), traumatic brain damage was immediately detected.
Notwithstanding those facts — all part of the record before the Board, which consisted of plaintiff’s Army and Veterans Administration records and of statements by Drs. Smith and McCoy — the Air Force Correction Board denied plaintiff’s application, an action necessarily involving the conclusion that his chronic brain damage did not constitute permanent disability. This conclusion as well goes against the substantial weight of the evidence.
*315 Defendant, citing and relying on Friedman, Executrix, v. United States, 159 Ct. Cl. 1 (1962), 310 F. 2d 381, cert. denied in Lipp, et ad. v. United States, 373 U.S. 932 (1963), has raised as an affirmative defense the statute of limitations. We conclude, however, as we have held before, that the rule of the Friedman case, supra, requires action by a statutory board, such as a Ketiring Board, before the statute begins to run. The first statutory board to render a decision adverse to this plaintiff was the Correction Board, which acted well within the limitations period.
Judgment is entered for plaintiff for disability retirement pay from the date of his release from the Army, less appropriate credit for payments which he has received from the Veterans Administration. The amount of recovery will be determined pursuant to Rule 47(c) (2).
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Service history. Plaintiff became an Aviation cadet in January 1942, a second lieutenant in the Air Reserve in October 1942, a first lieutenant AUS-AC in June 1944, and was demobilized as such on July 22, 1945. In July 1942 he was examined and found physically qualified for flying duty as a bombardier, in which MOS (i.e., military occupational specialty) capacity he served in the Pacific Theater from April 10,1943 to January 21,1944, and engaged in 14 combat missions.
2. Jeep accident. On or about September 12,1943, plaintiff was injured in a service-connected accident when a jeep in which he was riding near his base in New Guinea collided with an Army truck, causing plaintiff’s forehead to strike the windshield violently. He was first treated at an Army dispensary, where he was diagnosed to have a lacerated scalp, mild concussion, contusions of both legs, multiple abrasions and lacerations, and observation was recommended for fracture of his right frontal skull bone. Within hours he was transferred to the 171st Station Hospital with injuries de *316 scribed as major and minor lacerations above the right eyebrow, penetrating wound in right shin, scattered abrasions, and a broken nose. He was diagnosed as having a mild cerebral concussion. The right side of his face was swollen and his right eye was closed. His cuts were sutured and his head was bandaged. When the bandage was removed at the end of a week he complained of double vision, technically known as “diplopia.” He was discharged to quarters on September 17, but, because of complaints of double vision, he reentered the hospital on October 5, 1943 and spent the balance of that year undergoing observation in a succession of hospitals in the Pacific Theater.
3. Eye diagnoses at overseas hospitals. During the period from September 12 to December 29, 1943, when the plaintiff was held for observation in three military hospitals in the Pacific Theater, various diagnoses were made of his complaint of double vision. Collectively, these diagnoses were: post-traumatic diplopia, caused by right hypertrophia of six degrees, crossed diplopia, diplopia in all fields except extreme right, diplopia in all nine cardinal fields. This last mentioned diagnosis means that the plaintiff’s eyes failed to focus simultaneously in all directions, so that his two eyes would look in different directions and produce double images. The diplopia was considered to have been caused by paralysis of the right superior oblique muscle in the orbital cavity with possible injury to the pulley of the oblique. There are two groups of muscles which keep the eyes in balance, one in the horizontal and one in the vertical plane. Functioning properly, these muscles permit normal stereoptic vision. Injury to these muscles may impair stereoptic control and produce double vision. Injury to the plaintiff’s superior oblique muscle could have been caused by a direct trauma or by damage to the nerve supplying the muscle, the latter being the more likely hypothesis since there was no evidence of rupture of the muscle. Until February 1945 the plaintiff had to tilt his head to the left in order to attain stereoptic vision and see singly.
4. Overseas disposition board, October 191¡3. A disposition board convened at the 105th General Hospital overseas *317 on October 27,1943, considered plaintiff’s reclassification and found that he was unfit for military service in the Pacific Theater by reason of diplopia, moderately severe, traumatic, caused by malfunction of superior oblique muscle of right eye, following accident, when his head struck the windshield of the jeep. The board recommended plaintiff’s evacuation to the United States by water, air transport not being suitable, for further observation, treatment and disposition. On December 29, 1943, plaintiff left on the hospital transport U.S. GRANT and reported to Letterman General Hospital in San Francisco on January 21, 1944,-whence he was sent to McCloskey General Hospital at Temple, Texas, arriving there on January 27, 1944, via the Station Hospital at Fort Logan, Colorado.
5. Hospitalization and disposition hoard in United States in 19U-
(a) From January 27 to August 2, 1944, plaintiff was hospitalized at McCloskey General Hospital in Texas and Fort Logan Station Hospital in Colorado, except for 60 days sick leave at the former, during which leave he was married on February 18,1944.
(b) At McCloskey no muscle derangement of plaintiff’s eyes was found objectively, but he was diagnosed to have slight crossed diplopia, due either to paralysis of the left superior rectus (another eye muscle) or, more probably, to a spasm of the right inferior oblique muscle, with some involvement of the optic nerve resulting in a slight area of anesthesia in the right forehead, thought to be the result of a rather mild cerebral concussion. At that time plaintiff complained only of slight double vision and it was thought he had recovered probably 75-90 percent since his injury. On May 1, 1944, he was found to be in an improved condition and was transferred to Fort Logan Station Hospital for further observation, treatment and disposition, arriving there May 8, 1944.
(c) On admission to Logan plaintiff’s diplopia had improved greatly over his original condition, but he complained of occasional double vision, particularly when tired or after looking intently at an object. On July 27,1944, a disposition *318 board convened at Logan. It diagnosed other diseases of plaintiff’s ejes to be mild esophoria (inward deviation) of the right eye secondary to the wound, manifested by diplopia. He had 20-20 vision in each eye. The board was of the opinion that maximum hospital benefit had been attained and recommended that plaintiff be discharged from the hospital and assigned to temporary limited duty in the United States for six months, with reexamination and reevaluation of his physical condition at the end of the period.
(d) Plaintiff was released from Fort Logan Hospital on August 2, 1944, and was sent for processing and reassignment on temporary limited duty to the Miami Beach AAF Redistribution Station No. 2. Here he was examined on September 5, 1944. Diplopia was found in all directions of gaze, with noncomitance (inability to bring image into eye). It was thought that plaintiff’s diplopia was due to limitation of motion of superior oblique and superior rectus muscles as a result of “scarring”. Both esophoria and exophoria (outward deviation of the eye) were found, minimal, but definite, causing persistent, although variable and periodic, diplopia, which appeared to be subsiding. Plaintiff was found disqualified for all flying duty, was permanently grounded and lost considerable pay during his remaining tour of duty.
6. Temporary limited duty. Disposition "board February 19J¡£.
(a) Plaintiff was sent to Tinker Field, Oklahoma, reported there September 28,1944, and supervised collection of trash, etc. Plis physical activity was limited due to his accident overseas. He was then sent to a personnel affairs activities school at the Wright Patterson Air Field, where he remained January 19 to March 2, 1945. In February 1945, at the end of the six months period of temporary limited duty, he was reevaluated at the Wright Patterson AAF Regional Hospital. His complaints were some visual blurring after long sustained reading, occasional headaches and tendency to diplopia, particularly in rapid focusing of eyes from one object to another. His diplopia was described as mostly horizontal, with a slight vertical component, due to right superior oblique weakness.
*319 (b) A disposition board on February 27, 1945, recommended a second six months period of limited duty, with subsequent medical reevaluation. It stated that plaintiff be assigned duties not requiring a great amount of close work. The board’s diagnosis was asthenopia (weakness of eye muscle) , chronic, mild, secondary to esophoria following injury. The degree of disability for military service was found to be partial and temporary. The board’s recommendation was approved. On March 3, 1945, special orders assigned plaintiff to Tinker Field, Oklahoma, where he served until June 4, 1945, as a Special Projects Officer in connection with maintenance and repair projects. His performance in this capacity was rated “Excellent.”
7. Release from active duty.
In June 1945 plaintiff was sent for separation to Camp Chaffee, Arkansas, where on June 4, 1945, he underwent a routine termination physical examination. The report of physical examination makes a brief reference under “Medical History” to the fact that plaintiff “Complains of double vision”. The report refers to plaintiff’s eyes and vision as being normal.[4] He was found not permanently incapacitated for general service, and on July 22, 1945, was relieved from active duty by reason of demobilization, and not by reason of physical disability. Plaintiff was on terminal leave from June 4,1945 to July 22,1945.
8. Plaintiff’s reserve corps activities. On June 21, 1951, at his request, plaintiff was assigned to the 9808th VAST Squadron, Harrison, Arkansas, and during the four-week period from May 29, 1951 to June 26, 1951, he earned five Equivalent Training Points. There is no indication that his activities in the reserves consisted of anything other than to attend meetings. He did not participate in active duty training tours, and did not renew his reserve commission when it expired on April 1,1953.
*320 9. Plaintiff’s failure to apply for physical reevalaation. At no time subsequent to Ms release from active service on July 22,1945, did plaintiff seek to be reexamined or reevaluated by tihe Army.
10. VA disability compensation application — 1945. On June 18,1945, plaintiff filed an application with the Veterans Administration for disability compensation alleging injury to the muscles and nerves of the eye, and nausea in mornings since August 1944. When plaintiff was examined by the Veterans Administration on November 20, 1945, he complained of eye trouble and early morning nausea, in addition to other matters not relevant to the present issues. Much of this examination was performed at the Tulsa Clinic, one of whose doctors reported esophoria (eye muscle imbalance) of Y or 8 degrees. On December 1Y, 1945, the Veterans Administration rated plaintiff at 0 percent disability for the esophoria of Y or 8 degrees in his left eye, and 0 percent disability for his head scars and external hemorrhoids.
11. Lay observations of plaintiff’s post-service condition. Plaintiff, two of his old prewar friends, and plaintiff’s mother testified as to the physical manifestations of plaintiff’s condition at and shortly after the time of Ms release from the Army in 1945. To some extent this testimony may be discounted because of its lay sources and the possibility of bias or partiality. Nevertheless it is worthy of consideration. Collectively, this testimony was that plaintiff complained frequently of double vision, which worsened when tired. His eyes diverged at times, would not focus, made it difficult for Mm to read or drive, particularly at night when he was susceptible to being blinded by oncoming lights. He suffered from severe headaches, and was too nauseated in the mornings to eat. He had dizzy spells and occasional seizures or blackouts, during which he would be unable to concentrate and assumed a peculiar look in Ms eyes. His moody, unfriendly attitude with people contrasted with his friendly disposition before the war. He was nervous and jittery, and given to violent outbursts during which he would strike those he loved (i.e., slapped Ms young sister, punched Ms first wife in the nose).
*321 12. Medical treatment, 1915-1950, and testimony.
(a) Dr. Smith. Dr. William Orlando Smith is a highly accredited eye, ear, nose and throat specialist practicing in Tulsa. He is not a neurologist. Plaintiff was a patient of his before the war, at which time plaintiff’s eyes were normal. On October 9, 1945, he examined the plaintiff for double vision and recurrent headaches. His examination revealed extreme imbalance of the eye muscles (24 degrees of exo-phoria — the maximum outward eye deviation which his apparatus could measure — and 3 degrees of left hyperphoria, i.e., upward deviation of the eye), with double vision so severe that he considered plaintiff to be totally disabled and unable to do physical or mental work until the condition was corrected, or to perform full military duty in the field in time of war. (Note the extreme contradiction between this report and that of the Tulsa Clinic one month later, as reported in finding 10, sufra. The two reports are completely irreconcilable. That made by Dr. Smith is relied on here, for he testified, and Tulsa Clinic representatives did not.) Dr. Smith advised that the loss of stereoptic vision, or ability to bring things together, brought about a highly nervous state. He examined plaintiff again on the eve of trial in 1961 and found him unchanged since 1945, except that plaintiff no longer had double vision because he adjusted to it. Dr. Smith testified at trial as a witness called by the plaintiff, and made a favorable impression as to his qualifications and objectivity
(b) Dr. Glass. Plaintiff was examined by Dr. Glass of Tulsa in December 1945 and in 1947 or 1948, but Dr. Glass was deceased prior to trial and his records of treatments to plaintiff were not available for the record.
(c) Dr. McOoy. Dr. O. B. McCoy of Harrison, Arkansas, where plaintiff has lived since 1946, examined and treated plaintiff on numerous occasions commencing in November 1949. Dr. McCoy was a flight surgeon in the Air Force for 31/2 years during World War II. He is a general practitioner. Dr. McCoy was not only plaintiff’s physician, but was also a close personal friend who shared many social occasions with plaintiff. Plaintiff consulted Dr. McCoy formally and informally on many occasions for complaints such as *322 headaches and blackout spells. Dr. McCoy observed that plaintiff suffered from headaches, blackout spells, loss of temper, periodic desire for solitude and avoidance of people, loss of ability to concentrate, depression, etc. He thought plaintiff might suffer from petit mal epilepsy, and in 1950 requested the Veterans Administration to hospitalize plaintiff for observation, including X-rays, neurological consultation and electroencephalograms. The facts as to study by the Veterans Administration of plaintiff’s complaints in June 1950 are reported in finding 13, infra. During the years from 1950 to 1955 plaintiff claims to have had various seizures, which Dr. McCoy attributes to suspected cerebral hemorrhage and subdural hematoma. He does not think plaintiff was fit for active or general military service at time of his release, and that at best he could perform very limited service. The commissioner could not place full reliance on the accuracy of Dr. McCoy’s testimony as plaintiff’s witness because he testified from memory and without the aid of office records.
(d) Defendant offered no medical witnesses.
13. VA hospitalisation in 1950.
(a) On June 1, 1950, plaintiff applied to the Veterans Administration for hospital treatment alleging “spells” resembling petit mal epilepsy and requesting X-rays, en-cephalograms, neurological consultation, etc. Plaintiff entered the Veterans Administration hospital at Fayettesville, Arkansas, on June 5,1950, and was discharged the following day. He was given a superficial neurological examination but no X-rays or encephalograms. He informed the examining physician that about three weeks before he had developed a severe pain in the suboccipital region, felt faint, almost blacked out, and felt weak and nauseated. Two weeks later he experienced a less severe episode. Plaintiff also stated that he had been feeling nauseated and weak every morning for the preceding three or four years. The attending physician made no diagnoses of plaintiff’s condition, but reported his impression of “Syncope, cause undetermined.” Syncope is defined in Dorland’s Medical Dictionary as a swoon or fainting due to cerebral anemia.
*323 (b) On June Y, 1950, plaintiff filed another application with the Veterans Administration for hospital treatment. The application was made out by Dr. McCoy, who described symptoms of attacks like epilepsy which were becoming more frequent and severe, and stated that the plaintiff “needs encephalography and imperative to have electroencephalograph”. However, the attending physician at the Veterans Administration hospital in Little Eock, Arkansas, concluded that hospitalization ivas not urgent and that plaintiff would be hospitalized when a bed was available.
14. VA hospitalisation in 1955.
(a) On April 18, 1955, plaintiff was admitted to the Veterans Hospital at Little Eock, Arkansas, with complaints of headaches, blurring and double vision, and blackout spells. Through June 9, 1955, he was given a thorough examination, including physical, neurological, EENT, laboratory examinations, and electroencephalograms. He advised the attending physician that the visual difficulties from which he suffered at the time of his release from service in 1945 gradually improved over the years until, in 1955, he had no difficulty except that after reading fine newsprint for some period of time the lines appeared to overlap. However, he stated that in the three or four years preceding 1955 he had been having severe blackout spells accompanied by sharp head pains, increased tension, dizziness, and brief unconsciousness about twice yearly, and lighter attacks occurring as often as once a week. Upon examination his eyes appeared to be normal, and his prior condition of muscle imbalance and esophoria of Y or 8 degrees was not found. The Veterans Administration reached the following conclusion and final diagnoses:
In view of the patient’s history of a definite head injury followed by visual disturbances and with his later developing a convulsive disorder and in view of his scattered neurological findings, such as slight difference in muscle tonus and muscle strength in the left extremities and occasional positive Babinski on the left and the difference in otocaloric reaction being considerably diminished on the left in comparison to the right and changes in the audiogram indicating very definite nearing loss particularly for the higher frequency tones, and in view of the positive EEG tracing indicating high volt *324 age spiking and slow wave activity, it is felt that the patient does have a convulsive disorder which is secondary to a chronic brain syndrome due to trauma, gross force, received as the result of jeep accident while m military service in New Guinea in 1943. * * *.
*****

Final Diagnoses:

1. Chronic brain syndrome associated with brain trauma, without psychotic reaction, (a) moderate; (b) external precipitating stress: Head injury as the result of jeep accident received in New Guinea September 19, 1943; (c) premorbid personality and predisposition: Stable, well adjusted individual; (d) degree of impairment: Moderate. (Trtd; Imprvdj
The estimated incapacity recorded in this examination is for fuller psychiatric study and treatment purposes. It is not determinative as a basis for compensation or pension.
2. Grand mal, secondary to Dg. 1. (Treated, Improved)
3. Hemorrhoids, external. (Treated, Improved)
4. Scars, multiple, linear, supra-orbital region, right, and right forehead. (Untreated, Unchanged)
(b) On the basis of the above findings and history, plaintiff was given a service-connected 30 percent disability rating from April 18, 1955 for chronic brain syndrome associated with brain trauma, without psychotic reaction, with grand mal. The trauma was found to have occurred by reason of plaintiff’s jeep accident in 1943.
15. Plaintiff's condition since 1955. Since his hospitalization by the Veterans Administration in 1955 plaintiff has continued to suffer from spells in which he does not seem to see or hear, which are followed by confusion, headaches and occasional falls. He claims also to have difficulties with double vision, night blindness, morning nausea, and fits of depression. He is under anti-convulsive medication prescribed by the Veterans Administration. He was hospitalized from June 12, 1951 to July 12, 1957, at the Veterans Hospital in Little Nock, with complaints of increasing frequency of light seizures, manifested by tension, dizziness, and blurred vision. He was discharged with a diagnosis of encephalopathy due to head trauma, with grand mal. He *325 was again hospitalized at Little Nock from April 23,1959 to June 5, 1959, with a complaint of a headache lasting for three months, and increasingly frequent seizures during that period. The following conclusions and diagnoses were made on the occasion of this hospitalization:
Psychological Consultation: Obtained to evaluate the possible presence of organicity versus an inadequate personality which the patient has apparently been all of his life, with the head trauma (from history) and the resulting minimal if any organicity only serving to increase the more dominant and long-standing inadequate personality. From the patient’s performance upon a battery of tests the projective material given by the patient was interpreted as that consonant with an inadequate personality. Evidence for the presence of organicity was scanty. In summary, the personality of the patient is that of inadequacy. However, the presence of organicity is admissible but very minimal and not incapacitating.
* $ # ❖ *
8. Status at time of this summary: This patient has a history of head injury in 1943 at which time he was rendered unconscious for an undetermined period of time, followed by headaches, diplopia, and alterations in consciousness. During a previous period of hospitalization at this hospital he was observed to have a sub-clinical seizure at which time an abnormal EEG tracing was obtained, characteristic of a convulsive disorder. There are still minimal residual neurological findings which are scattered, and which are in keeping with residuals of a concussion, even though present EEG tracings are within normal limits and no seizures have been observed or reported during his present hospitalization. Patient’s behavior on the ward, as well as his response to various psychological tests are indicative of an inadequate personality with minimal evidence of organicity. Patient’s condition is now considered to be well stabilized with his present dosage of anticonvulsive medication.
❖ * * $ $
11. Established Clinical Diagnoses:
1. Encephalopathy, due to head trauma. (Improved)
2. Grand mal, secondary to Dg. 1. (Improved)
3. Scars,_ multiple, linear, right supraorbital region and right forehead. (Unchanged)
4. Inadequate personality. (Unchanged)
*326 16. Correction Board 'proceedings.
(a) On February 20, 1956, plaintiff filed an application with the Air Force Board for the Correction of Military Records. On August 1, 1956, the Board denied the application and informed him that no further consideration would be given to it in the absence of material additional evidence showing the commission of an error or injustice. The Board had been notified by the Air Force that at the time of his separation plaintiff’s only complaint had been double vision and that plaintiff “was not permanently incapacitated for active service at time of separation in July 1945, according to available records.” In 1959 plaintiff requested the Board to reconsider his claim, presenting as additional evidence written statements of Dr. Smith (see finding 11(a), supra).
(b) There were before the Board or available to it plaintiff’s Army medical records (his 201 file), the Veterans Administration medical records, and the statements of Dr. McCoy and Dr. Smith. Of the Veterans Administration records, the plaintiff emphasized and submitted a copy of the 1955 Discharge Summary of the Veterans Administration containing the diagnosis of brain injury, as referred to in finding 13, supra.
(c) Upon the basis of these records, plaintiff’s representative, through a communication sent to United States Representative J. W. Trimble and by him to the Board, and in oral argument before the Board, presented the following reasons for allowance of the claim:[5]
(1) Plaintiff’s chronic brain syndrome was not discovered by the Army, Veterans Administration and private doctors until 1955, when it was ascertained as a result of the thorough examinations and tests, particularly neurological and electroencephalographic, of the Little Rock Veterans Administration Hospital. (This was the ground on which Veterans Administration awarded plaintiff a 30 percent disability from April 18,1955.)
(2) Plaintiff’s condition in 1945 was essentially the same as in 1955 when the diagnosis was made.
*327 (3) After his head injury in October 1943 plaintiff never performed general duty and was found fit only for limited duty by all of the disposition boards, three in number, that considered his case.
(4) His separation in June 1945 without the medical reevaluation that had been ordered in February 1945 was contrary to his orders and violative of the regulations.
(5) Had plaintiff’s chronic brain syndrome been recognized at the time of separation, he would have been sent to an Army retiring board.
(d) Public Law 220, 82d Congress, 1st Session, which amended Section 207 of the Legislative Reorganization Act of 1946 (65 Stat. 655) provided that the respective Secretaries of the Army, Navy, and Air Force, could set up procedures for the correction of military records. Pursuant to that statutory authority, the Secretary of the Air Force issued AFR, 31-3, dated November 3,1952, which was in effect at times here relevant, and provided that an application for correction could be denied by the Air Force Correction Board if it determined that a sufficient basis for review had not been established.
17. Correction Board denial on reconsideration. On December 22, 1959, the Correction Board denied plaintiff’s application for reconsideration, and the denial was duly confirmed by higher authority. Plaintiff contends that the decision of the Correction Board was arbitrary, capricious, contrary to the evidence, unsupported by substantial evidence and violative of the Army Regulations, for three principal reasons, viz:
(a) In its 14 findings the Board made no comment on plaintiff’s chief legal contention that his separation from service without a medical board reclassification of his status from limited to general service was contrary to regulations. Nor did the Board refer to specific regulations requiring a finding of permanent incapacity for active service, although it did say that there was no showing of such permanent incapacity as of July 22,1945.
(b) The Board erred in giving consideration to ex parte communications and advice it received from a medical officer of the Air Force Personnel Council and from a *328 representative of tbe Surgeon General’s office, which communications were relied on by the Board in its decision, although they were not brought to plaintiff’s attention, nor was plaintiff given an opportunity to comment on them or refute their contents.
(c) The Board ignored plaintiff’s contentions as to the effect of the various diagnoses of plaintiff’s physical condition from 1943 to date of hearing on the question of whether plaintiff was permanently incapable of performing active duty at the time of his separation in 1945. The Board had before it plaintiff’s complete medical record and its summary of the facts indicates that it gave consideration to the plaintiff’s entire medical record. The plaintiff’s complaint is that the Board failed to appreciate the significance of or give proper weight to various facts in the plaintiff’s medical record bearing on his condition in 1945. Finding 14 in the Board’s decision summarizes the facts and reasons for its action in the following language:
14. The Board has carefully reviewed and considered the application with its supporting documents, and the pertinent military and Veterans Administration medical records. The records show the applicant incurred an injury while in the service following an automobile accident, which resulted in double vision. He met a medical disposition board in July 1944 which recommended six months temporary limited service. After about five months duty he was hospitalized due to complaints of difficulty with sustained reading. In February 1945 a medical disposition board recommended six months temporary limited service. After a month of duty he was processed for separation due to demobilization. Final type physical examination notes the complaint of double vision; however, his eyes were otherwise normal with 20/20 vision, bilateral. No other complaints were recorded. He was found not permanently incapacitated for general military service.
The applicant was separated from service by reason of demobilization on 22 July 1945. He was examined by the Veterans Administration on 20 November 1945, with a recorded Chief Complaint of “Throbbing pain toward lower spine. Trouble with eyes. Is nauseated in the early morning. Tarry stools. Hemorrhoids.” His disability was rated at zero percent. The applicant *329 was hospitalized by that Agency on 18 April 1955 due to headaches, double vision, and blackout spells. The VA Narrative Summary records the following pertinent information with reference to vision: “He states that his visual difficulties gradually improved over a period of several years until at the present time'he has no difficulty except after reading fine newsprint for some period of time. There is still a tendency for the lines to appear to overlap.” At that time a diagnosis of Chronic Brain Syndrome with grand mal seizures rated at 30% was made.
For one to be retired by reason of physical disability in 1945 there must be a finding that the member was permanently incapacitated for the performance of active military service at time of separation. After careful consideration of all the facts and evidence before it, the board concludes that the applicant’s physical defect did not render him permanently incapacitated for the performance of active duty on 22 July 1945. Accordingly, his application should be denied.
18. Plaintiff's use of intoxicants. Plaintiff’s first wife, whom he married on February 14, 1944, while in a patient status at McCloskey General Hospital, and who divorced plaintiff in 1955, testified at a deposition hearing, at which plaintiff and his counsel were present, with respect to plaintiff’s excessive drinking. Plaintiff himself admitted on cross-examination at the trial that he had drunk to excess, and plaintiff’s second wife, whom he married on October 14, 1957, admitted on cross-examination that she had told the Veterans Administration Hospital on July 21, 1959, that plaintiff “had been drinking all day Saturday, Sunday, and Monday prior to the entrance” [into the hospital]. The Discharge Summary of the Clinical Record of plaintiff’s hospitalization July 21, 1959, reflects that plaintiff’s second wife told the Veterans Administration doctors that recently, particularly when he began having spells, plaintiff had been drinking up to one fifth of whiskey per day, or 10 to 12 cans of beer per day “until he passes out”, and then he remains drunk for three or four days. There is no evidence, however, that plaintiff’s disability is due to excessive drinking rather than to his head injury. None of the medical records in the case infer that alcoholism was a factor causing plaintiff’s condition.
*330 19. Plaintiff’s record of civilian employment.
(a) From 1945 to 1948 plaintiff had an interest (provided by his father-in-law) in an automobile distributorship in Little Book, Arkansas, but had a disagreement with his co-owners and sold out his interest.
(b) From 1948 to 1956 plaintiff was in the chicken broiler business in Harrison, Arkansas, and went bankrupt in 1956.
(c) From 1956 to 1958 he worked at various jobs, including work at a hotel and at filling stations.
(d) From January 1958 to the time of trial in 1961 plaintiff worked as a substitute mail carrier. Although he had passed the examination for rural mail carrier, he was rejected on medical grounds because of his SO percent disabling head injury. In connection with a medical examination taken in January 1958 for the substitute carrier job, plaintiff made the statement that for the two preceding years he had had no symptoms of chronic brain syndrome resulting from his head injury. He was found physically qualified for the job of substitute carrier. His record shows that to date of trial plaintiff had used up all of the sick leave allowance.
20. Permanent, incurable disability? It is reasonable to conclude that the condition from which the Veterans Administration found that plaintiff has suffered since April 18, 1955, and which it found resulted from the jeep accident in 1943, existed for many years prior to 1955 but was not diagnosed.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover,, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Buie 47 (c) (2).
In accordance with the opinion of the court 'and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on December 18,1964, that judgment for the plaintiff be entered for $33,844.11.

 Plaintiff testified at trial that, save for a blood test, the examination consisted of questions and answers. In any event, it is apparent that it was routine in the extreme.

 The statute under which plaintiff claims entitlement to disability retirement, section 5 of the Act of April 3, 1939, as amended (10 U.S.C. Supp. IV, 456, 1946 Ed.), speaks of “disability” rather than of “incapacity for active service.” The terms, however, are synonymous, as was noted in Par. 23 of War Department Technical Manual TM 12-245, 1 October 1945:
“b. The word ‘disability’ as used in section 5 of the Act of 3 April 1939, as amended, with respect to retirement pay benefits means such disability as would constitute a basis for the retirement of Regular Army Officer personnel. Thus, what constitutes ‘incapacity for active service’ for Regular Army officers likewise constitutes ‘disability’ for officers who are not Regular Army officers.”

 The manual was published several months after plaintiff’s release. Par. 60a (2), however, was designed to explain and interpret the law as it already was; thus this explanation is of value here.

 This examination was reported on WD AGO Form 03, which refers at the top to AE 40-100 and 40-105, and states that it is to be used for all physical examinations of individuals on an officer status, or for appointments as such. As to plaintiff it reported that he was not permanently incapacitated for general service, but did not report whether he was or was not permanently incapacitated for limited service. These determinations, the plaintiff contends, are to be made by the medical officers according to standards prescribed in AR 40-100 and 40-105.

The grounds for error cited in plaintiff’s application to the Correction Board vary somewhat from those presented orally to the Board by plaintiff’s representative at the time of argument for reconsideration, but the latter are in accord with the plaintiff’s present grounds.