Per Curiam :
This case was referred to Trial Commissioner Herbert N. Maletz with, directions to make findings of fact and recommendation for conclusions of law. Tbe commissioner has done so in an opinion and report filed on J une 16, 1965. Exceptions to tbe commissioner’s report and opinion were filed by defendant, briefs were filed by the parties and tbe case was submitted to tbe court on oral argument of counsel. Since tbe court is in agreement with the opinion, findings and recommendation of tbe commissioner, with one slight change, it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Plaintiff is therefore entitled to recover disability retirement pay from the date of his release from active duty, less amounts received from tbe Veterans Administration, and judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 47 (c).
OPINION OF COMMISSIONER*
Maletz, Commissioner :
This is a suit for disability retirement pay by a doctor who served on active duty in the Army Medical Corps from July 24,1942' to May 26,1946, when he was released from active duty not by reason of physical dis *391 ability. He contends that lie was permanently incapacitated for active military service at tlie time of Ms release and that the decision of the Army Board for Correction of Military Eecords and the Secretary of the Army to the contrary was arbitrary, unsupported by substantial evidence, and violative of Army regulations.
Plaintiff had been engaged in the general practice of medicine for some two years when, in 1942, at the age of 39, he volunteered for the Army. He was given a physical examination, found qualified for general service and commissioned as a 1st Lieutenant in the Medical Corps with an MOS of “Medical Unit Commander”, which MOS remained unchanged throughout his extended active duty service. He was released in 1946 with the rank of Lt. Colonel, AUS, then appointed a Major, OEC, and later promoted to Lt. Colonel, OEC.
Upon entry on active duty, plaintiff was trained as a combat medical officer attached to the Infantry and had no difficulty in performing the strenuous physical activities required. He served overseas in Northern France for 15 months, from November 1944 to February 1946, and during most of this period was attached to an Infantry Division as a Eegimental Surgeon commanding a medical company consisting of three battalions of medical platoons. As Eegi-mental Surgeon he was responsible for the health and for the treatment of the sick and wounded in combat of a regiment of 3,000 men who occupied a front of 40 miles. In supervising the “medics” under his command, he traveled long distances to battalion aid stations and front-line positions in jeeps, over rough terrain, during an extremely cold and damp winter with deep snow and, on occasion, was compelled to sleep in the field and in unheated houses. For his services, he was awarded the Bronze Star Medal and the French Croix de Guerre.
After the European war had ended, plaintiff, feeling extremely tired, sick and weak, was admitted in September 1945 to an Army dispensary in France complaining of gas-tro-enteritis (marked by diarrhea), and heart, back and feet pains. His condition was described as “Gastro-enteritis, acute, severe; cardiac observation; arthritis, hypertrophic, *392 feet, bilateral”, and lie was immediately transferred to the 235th Army General Hospital in France. There, an X-ray of the spine showed the presence of slight tipping of most of the bodies of the vertebrae as seen in an early osteoarthritis; the physical examination also showed a large varicosity in his left leg and thigh. The hospital diagnosed his condition as (1) chronic mild osteoarthritis of the thoracic and lumbar vertebrae (cause undetermined), and (2) physical inadequacy due to premature senility, both incurred in line of duty.[1] In the following month (October 1915), plaintiff was presented to a Disposition Board at the hospital which gave him a profile of “C 3 3 3111X, Duty C”,[2] thus finding, in effect, that he was not physically qualified for general military service but met the requirements for limited service. In plaintiff’s case the disqualifying factors, as evidenced by the profile, were his physical capacity or stamina, and his upper and lower extremities. The letter “C” and “Duty C” indicated he was to receive an assignment suitable to limited service and the letter “X” showed he had overseas service. He was discharged from the hospital in October 1945 and, since his old Division had been deactivated, he was assigned to a regiment in another Division where he was told not to do much and was given the relatively non-taxing duties of taking care of an old French chaplain and supervising the disinfection of displaced persons.
In the latter part of February 1946, plaintiff was returned to the United States for demobilization and on March 8, 1946, he was given an extremely brief and perfunctory terminal physical examination at the Fort Devens, Massachusetts Separation Center on the basis of which he was found not permanently incapacitated for general service. On the next day he was placed on terminal leave, effective March 10, until May 26, 1946, when he was released from active duty not by reason of physical disability. The report of the terminal physical examination contained plaintiff’s history of diar *393 rhea, back, arm and chest pains, and osteoarthritis, and showed that plaintiff still complained of his back pain. It pointed out that he had noticed the year before a slight tremor of his right hand on motion while eating; and that he had moderate varicose veins and a moderate varicocele. The report found plaintiff normal neurologically and psy-chiatrically. It made no reference, however, to the Army General Hospital’s diagnosis of physical inadequacy due to premature senility or to plaintiff’s low profile, nor did it recommend that plaintiff be re-profiled. There was no reexamination or X-ray to confirm or disprove the previous diagnosis of osteoarthritis and no diagnosis with respect thereto was given in the terminal physical examination. No neurological or psychiatric examination was given.
Contemporaneously with his relief from active duty, plaintiff, on March 10, signed an application for appointment to the Officers’ Reserve Corps in which he certified that he was in general service at the time of his separation. His application, which was accompanied by the report of his terminal physical examination, was accepted on the same day, at which time he was appointed a Major, ORC, pursuant to W.D. Circular 61 which provided that all non-regular AUS officers released after World War II service were to be offered commissions in the ORC commensurate with their commissions in the AUS, if they were found qualified for general service, limited service or general service with a waiver. See finding 14. About 10 months later, plaintiff was promoted to the rank of Lt. Colonel, ORC, which promotion was accomplished without further physical examination.
Prior to the time plaintiff was sent overseas, he was in excellent health and well able to undergo the rigors of strenuous combat training. He had great energy and drive; was ambitious, vigorous and strong, an ardent proponent of athletics, very friendly, outgoing, amiable, hospitable, likable, smiling and witty, alert mentally, enthusiastic, fluent of speech and stable. However, when he was released from active service, a great change had taken place in his physical and mental condition. He felt exhausted and nervous and didn’t care what happened. He appeared to have aged *394 greatly, was baggy under tbe eyes, bad lost much weight and seemed worn out and like a shell of his former self. In contrast to his former energy and strength, he appeared weak, greatly fatigued and lacking in stamina, and moved like a much older person. He had lost his ambition, energy and drive, as well as his interest in sports; he did not want to carry on any conversation; he was unconcerned and could not push himself; he was withdrawn, paid no attention to what one said to him, could not concentrate, was somewhat confused and disoriented, spoke very slowly and guardedly, and was very much less articulate than he had been. His personality too had drastically changed; he had become very nervous, paced around a good deal, was very short, irritable and quick to take offense, and was no longer a jovial person but a sober one. He had been an extremely observant Catholic, but after his discharge gave up church attendance although on occasion he went to retreat to gain peace of mind. Not prone to exaggerate his symptoms, he complained of much pain and discomfort in his chest, back, shoulders, ankles, hands, knees and feet; he had tremors in his right hand; he suffered from a severe pruritus ani which caused a great deal of insomnia;[3] and he suffered from migraine headaches. These mental and physical symptoms have persisted ever since his release from active duty.
Because of his disabilities, plaintiff’s medical practice had to be substantially curtailed. Prior to his entry on active duty, he was extremely ambitious in trying to build up his practice which he had started two years before, and in addition to keeping regular office hours of four hours per day, five days a week, he worked far more than these hours in making house calls and hospital visits, without limitation, day or night. Upon his return from the service, he was unable, because of his condition, to resume practice for the first *395 three or four months. Thereafter, he lacked the stamina to conduct a normal practice and instead had to limit himself to working four hours per day, four days a week (during which he maintained regular office hours), and Saturday mornings. Most of his other time was spent in sleeping or resting. He frequently refused to take telephone calls from patients; he made few house or hospital calls, turned down many patients and rejected an offer to handle VA cases on a fee basis on the ground that he was not up to it. In the period from 1963-64, he did some contract work for the National Guard, which involved giving an average of seven to eight general physical examinations a month to recruits. Due in major part to his inability, because of extreme fatigue, to take care of all the patients desiring his services, plaintiff’s total income has been $7,000 to $8,000 per year, which income was not only for his services but for the substantial help of his wife, a registered nurse, who worked in his office in place of a salaried girl.[4] To augment his income, he applied in 1963 for a part-time Civil Service position as a medical officer with the Post Office at $4.25 an hour examining applicants for Post Office employment and received a 10-point preference as a disabled veteran with a VA combined disability rating of 60% for “nerves” and “osteoarthritis”. (See m/m, p. 397.) Under physical standards pursuant to the governmental policy favoring the disabled, he was found by the examining physician “well able to do the work of a postal doctor,” but declined the position because the hours prescribed would have precluded him from continuing with any of his regular office hours in private practice.
Plaintiff had no actual military service since his release with the exception of a 14-day tour of duty in July 1948 with the National Guard at summer camp and a one-week tour of duty in October 1948 at the Walter Eeed Hospital in Washington, D.G., attending a class on medical aspects of atomic explosion. For his 14-day tour, he was given a physical examination at the station hospital, two days after he began *396 to serve, which found that he had pruritus ani, severe; varicose veins, left leg, moderately severe; and underweight. The report found he was normal neurologically and psychiatri-cally, although no neurological or psychiatric examination was given. On the basis of the physical examination, plaintiff was found permanently incapacitated for general service as a reserve officer by reason of “varicosity, left, greater saphenous, moderately severe.” He served out the tour, however, though he had no field duty, but rather served at the dispensary and sick call, and examined boxers in the recreation program. According to a fellow medical officer who was on the tour at the same time, plaintiff complained of soreness and stiffness of back, shoulders and hands, felt poorly, easily fatigued, obviously lacked stamina and presented a worn-out appearance. Some three months after the termination of the tour, the Army found him physically qualified therefor, with waiver for underweight and varicose veins, left leg. For his October 1948 tour at the Walter Eeed Hospital, plaintiff executed a certificate in lieu of physical examination certifying that he considered himself sound and well and physically qualified for full military service. In 1949, plaintiff was transferred to the Inactive Eeserve for failure to reply to official correspondence and in 1952 was honorably discharged from the OEO for the same reason.
In the meantime, plaintiff’s wife and a veterans organization representative had urged him to apply for VA disability which he refused to do because of pride; because he didn’t think a doctor should have a disability or get a pension; and because he wouldn’t admit that there was anything wrong with him. Ultimately, in November 1948 (one month after his tour of duty at Walter Eeed), he filed a VA application and was given thorough physical and neurological and psychiatric examinations in 1949,1950 and 1954, which were the first such complete examinations he had had. The neurological examinations found, in essence, that he had been subjected to horrible sights in combat; that he appeared 10-20 years older than his stated age; that he looked like a pale, tired old man with a blank expression; that he was tired, lazy, lacked pep and did just enough work to keep alive; that he couldn’t take care of patients because of extreme fatigue and *397 headaches; that he had puffinesa beneath his eyes; that he had tremors of the eyelids and extended fingers; that he had a wealth of somatic complaints which included pruritus ani, joint aches and pains, cardiac pain, migraine headaches and dizzy spells; and that he did not exaggerate his symptoms. The YA’s neurological diagnosis, based on the 1949 examination, was moderate degree of incapacity by reason of psychogenic somatization reaction [a form of psychoneurosis] [5] manifested by multiple somatic complaints, pruritus ani, joint aches and pains, chest pains, shortness of breath, etc., with external precipitating stress, moderate, from 4 years of Army regimentation, 16 months in the European Theatre of Operations and 6 months in combat.[6] Based on the findings and diagnoses of the YA’s 1949 examination and plaintiff’s Army medical records, the YA determined that plaintiff’s disabilities were service-connected and rated them as follows:
(1) 30 per cent for osteoarthritis, generalized, dorsal and lumbar spine, both ankles and feet.
(2) 30 per cent for psychogenic somatization reaction with multiple somatic complaints, pruritus ani and migraine.
(3) 10 per cent for varicose veins, left lower extremity, symptomatic.
The individual ratings totaling 70% were combined under the YA Schedule for Eating Disabilities to 60%. On the basis of the subsequent examinations in 1950 and 1954, this rating has been continuously confirmed by the YA and the same ratings were in effect in October 1963.[7]
In May 1958 plaintiff applied to the Army Correction Board for correction of his military record to show that he was retired by reason of physical disability as of May 26, *398 1946. In July 1958 the Surgeon General’s Office submitted an opinion to the Board that the record failed to support plaintiff’s contention of error or injustice in the medical aspects of his separation in 1946 and that he presented no physical or mental disability which would have warranted his retirement for disability under the rules, laws, regulations or policies ha effect at that time. See finding 30. The Correction Board held a hearing on January 14, 1959, and on the same day recommended denial of plaintiff’s application, concluding that “it concurs in the opinion of the Surgeon General’s office to the effect that the applicant’s failure to be relieved from active duty on 26 May 1946 by reason of physical disability with entitlement to retirement pay, is neither erroneous nor unjust.” This recommendation was later approved by the Secretary.
The applicable Army regulations then in effect (finding 25) provided that an officer was incapacitated for active service if he were permanently physically or mentally incapable of performing full military duty (i.e., general service), field as well as garrison, hi both peace and war, even though he could perform limited service with the supply arms and services.[8] See Weiner v. United States, 148 Ct. Cl. 445, 455 (1960) ; Harper v. United States, 159 Ct. Cl. 135, 140, 310 F. 2d 405, 408 (1962) ; Grubin v. United States, 166 Ct. Cl. 272, 279, 333 F. 2d 861, 864 (1964) ; Bevins v. United States, 166 Ct. Cl. 547, 558 (1964) ; Woodard V. United States, 167 Ct. Cl. 306, 312 (1964). Against this background, the Board had the following evidence before it: The medical *399 records of .the Army and YA, including the YA reports of medical examinations, diagnoses and ratings;[9] the oral testimony of plaintiff and of a friend, a veterans organization representative, who knew plaintiff before and after his release from active duty; an affidavit of plaintiff; written statements by two former Army officers who knew plaintiff for a number of years; and a written statement by a fellow medical officer as to plaintiff’s condition during his two-week tour of active duty in July 1948. The evidence before the Correction Board showed plaintiff’s excellent physical and mental condition at the time he entered the service; his arduous duties in combat training; his extreme devotion to duty and arduous combat service; his symptoms and hospitalization in 1945 and the diagnosis of osteoarthritis, physical inadequacy due to premature senility, and varicose veins; his Disposition Board in 1945, its profile findings which showed that he was not physically qualified for general military service but met the requirements for limited service, and his assignment to less strenuous duties; his final terminal physical examination at the Separation Center and the perfunctory and extremely brief nature thereof; his appointment to the OBC at the time of separation; his active duty training in 1948 and attendant physical examination and subsequent waiver; his certification that he considered himself qualified for full military service; his inability to perform general active service in his two tours of duty in 1948; his disabilities at and subsequent to his release; the YA physical and neurological examinations showing he had generalized osteoarthritis of the dorsal and lumbar spine and both feet, a psychoneurotic condition, and varicose veins; the fact that these were the only neuropsychiatric examinations plaintiff had, the Army having failed to supply them; and the YA continuous, combined 60% disability ratings from the time he applied in 1948.
On the basis of this strong showing before the Board as to plaintiff’s actual symptoms and diagnoses in the service; *400 his condition at time of release as contrasted with his pre-service condition; his condition subsequent to release; and the findings of the physicians and specialists of the Veterans Administration who gave plaintiff his first psychiatric and neurological examinations, it must be concluded (i) that plaintiff proved that he was permanently incapacitated for general military service at the time of his release in 1946 by reason of psychoneurosis and osteoarthritis, and that his incapacity and the cause of his incapacity were incidents of the service; and (ii) that the decision of the Correction Board and the Secretary that plaintiff was not permanently incapacitated for general military service at the time of his release was arbitrary and not supported by substantial evidence.
It is true that there was evidence before the Board showing that plaintiff was found on terminal physical examination not permanently incapacitated for general service; that his MOS remained unchanged during the few months from his hospitalization in October 1945 to his return to the States; that he received upon separation an original appointment to the OBC; and that he certified in 1948 that he considered himself sound and well and physically qualified for full military service. However, “[t]he fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.” Williams v. United States, 130 Ct. Cl. 435, 441, 127 F. Supp. 617, 619 (1955), cert. denied 349 U.S. 938 (1955). See also Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951). Moreover, the significance of the terminal physical examination report in establishing plaintiff’s actual condition at time of release is seriously impaired in light of its extremely brief and perfunctory character; its failure to make reference to the plaintiff’s low profile or to the Army General Hospital’s previous diagnosis of physical inadequacy due to premature senility which suggested a psychiatric condition; and the failure to give plaintiff a neurological or psychiatric examination or to re-examine or X-ray him to confirm or disprove *401 the previous diagnosis of osteoarthritis.[10] “In the rapid demobilization of the Army after the war it is quite plausible that terminal physical examinations were not as thorough as they might have been in many cases and that a more intensive investigation * * * might have developed hidden clues of things to come.” Smith v. United States, 168 Ct. Cl. 545, 549 (1964). See also Woodard v. United States, 167 Ct. Cl. 306, 310 (1964). Nor would it seem pertinent to plaintiff’s fitness for general military service that his MOS remained unchanged during the few months from his hospitalization in October 1945 to his return to the States in late February 1946. There was no evidence that plaintiff’s MOS would have been changed if he were unable to perform the full duties of his MOS or that an officer’s MOS was customarily changed when a reduction of his profile serial took place. And if it were customary to change a MOS under such circumstances (assuming another MOS was available to fit the officer), it is hardly probable that this action would have been taken in October 1945 when it was known that plaintiff, a Keserve, was soon to be demobilized. The further fact that plaintiff upon release received an original appointment as a Major in the Officer Eeserve Corps would likewise appear to have little pertinence to his fitness under the full-duty standard, since the physical standards required for such appointments were fitness for general service or for limited service or for general service with a waiver. Nor can much weight be placed upon plaintiff’s certificate of physical capacity, since he was afflicted with a psychiatric ailment (see Ludzinski v. United States, 154 Ct. Cl. 215, 232 (1961)) and “neither * * * [he] nor [the] doctors fully knew the nature and extent of his disability at the time of his discharge.” Grubin v. United States, 166 Ct. Cl. 272, 277, 333 F. 2d 861, 863 (1964). And “[l]ike lawyers, medical men are often poor judges of their own cases * * *. The events here show that plaintiff was as far wrong as the Army * * * [doctors in knowing] * * * the true course of his disability.” Ibid. See also Harper v. United States, 159 Ct. Cl. 135, 310 F. 2d 405 (1962).
*402 At the trial in this court, the proof has again shown that at the time of his release plaintiff was suffering from psychoneurosis, osteoarthritis and other disabilities incurred in line of duty 'and which permanently incapacitated him for general service. Among other things, the evidence established that plaintiff sustained the psychoneurosis in the service due to his arduous duties in combat areas and the stress he experienced; that the neurosis was evidenced by his multiple complaints and the absence of organic findings to account for them; that his “physical inadequacy” was not due to premature senility, as found by the hospital in France, since there were no organic symptoms of premature senility, but was due to his psychiatric condition, as his subsequent history clearly revealed.[11] The evidence further established that a significant sign of plaintiff’s psychiatric condition was the tremor revealed at his terminal examination; that the first neurological examination which was given plaintiff in 1949 clearly disclosed the tremors as a basis of his psychiatric condition; and that had the Disposition Board in 1945 recognized the true nature and permanence of his psychiatric condition, it would have given him a profile serial disqualifying plaintiff even for limited duty.
The evidence at the trial also established the diagnosis of osteoarthritis. The X-rays, both in and after service, showed abnormalities in the spine, both ankles and both feet. Further, plaintiff’s complaints referable to this condition commenced in the service. In the 1945 hospitalization, he complained of pains in both feet and of back pains; in his terminal physical examination, he again complained of back pains; at the time of his release, he had pains in various parts of his body, including the back, feet and ankles, which pains continued as time went on; and in 1948, at the National Guard summer camp, he complained of back, shoulder and hand pains and registered similar complaints in his application to the VA and in subsequent examinations. From 1945 on, upon the basis of his complaints, physical exami *403 nations and X-rays, he was given diagnoses of osteoarthritis.[12] While the arthritis was diagnosed as “mild” in 1945, the Disposition Board gave plaintiff a “3” profile for upper and lower extremities (which included the back, feet and ankles). Such numeral rating was obviously for osteoarthritis and indicated that plaintiff was incapacitated for general service. Cf. Boraiko v. United States, 146 Ct. Cl. 814 (1959) ; Snell v. United States, 168 Ct. Cl. 219 (1964).[13] Also, in every finding of osteoarthritis, both by the Army and the YA, the condition was held to have been incurred in the service or in line of duty, and under the presumptions described in Army regulations,[14] no other line-of-duty finding would be warranted. Moreover, (1) the exposure of the plaintiff to conditions which cause or aggravate this disease, such as abnormal stress and strain, wear and tear, the unusual cold, inclement weather and deep snow, and the long rides in jeeps over rough terrain, and (2) the fact that many persons in the 40’s have no symptoms of arthritis would preclude the possibility of rebutting the presumptions by “clear and unmistakable evidence based on well-established medical principles”, as the regulations provided.
On the basis of the evidence before the court, plaintiff proved he was permanently incapacitated for general service at the time of his release by reason of psychoneurosis and osteoarthritis, and demonstrated anew that the decision of the Board to the contrary was arbitrary and lacking in substantial support.
*404 Tbe plaintiff is entitled to recover disability retirement pay from tbe date of bis release from active duty, less amounts received from tbe Veterans Administration.
FINDINGS of Fact

Plaintiff’s Badcgroimd, Service History, and Training in United States

1. Plaintiff, a doctor of medicine, volunteered in 1942, at the age of 39, for service in tbe Army. He was given a physical examination for appointment in June 1942 and found qualified for general military service.
2. At tbe time he volunteered, plaintiff had practiced general medicine from an office maintained in bis home in Rox-bury, Massachusetts (a suburb of Boston), for approximately two years. He had received bis medical degree from the Kansas City University of Physicians and Surgeons in 1937 and interned at Chicago and Jefferson Park Hospitals in Chicago from 1937 to 1939 where, among other things, he assisted in surgery.
3. Plaintiff entered active duty as a 1st Lieutenant, Medical Corps, Army of the United States, on July 24,1942. He served until May 26,1946, when he was relieved from active service as a Lieutenant Colonel, AUS. During his service, he was promoted to Captain, Medical Corps, AUS, on November 6, 1943, and to Major, Medical Corps, AUS, on December 19,1944. He was appointed Major, Medical Corps, ORC, March 10,1946, and was given a terminal leave promotion to Lieutenant Colonel, Medical Corps, AUS, on May 11, 1946. He was promoted to Lieutenant Colonel, Medical Corps, ORC, on January 8,1947.
4. Plaintiff was trained as a combat medical officer attached to the Infantry. His Military Occupational Specialty (MOS) throughout his extended active duty service was “Medical Unit Commander 3500” and in his certificate of service, he was described as a “Combat Medic”. When he was sent overseas in November 1944, he had become a Regimental Surgeon, i.e., the commander of a medical company consisting of three battalions of medical platoons which were headed by battalion surgeons. The term “Regimental Sur *405 geon” was an administrative title and did not require performance of surgery.
5. The medical personnel attached to the Infantry had to be as capable of performing in the field as were the Infantry personnel. The plaintiff was trained for combat service and in turn trained a detachment of 9 officers and 126 enlisted men for such service. This training involved combat maneuvers and activities such as running, jumping, climbing, crawling, digging, shooting, calisthenics, traversing obstacle courses, scaling 10-foot walls, and hiking from 10 to 25 miles. Plaintiff performed these arduous duties without difficulty and without complaint.

Plaintiffs Overseas Duties Prior to Hospitalization in September 19J¡.5

6. (a) Plaintiff served in the European Theater of Operations in Northern France from November 26,1944 to February 24,1946 — a period of approximately 15 months.
(b) He was attached to the 66th Infantry Division and as a Regimental Surgeon was responsible for the health of an entire regiment of 3,000 men and for the treatment of the sick and wounded in combat. The regiment consisted of three battalions of 1,000 men each who occupied a front of approximately 40 miles. In addition, plaintiff from time to time provided medical help for two divisions of French troops.
(c) In supervising his “medics”, plaintiff travelled long distances to battalion aid stations and front-line positions in jeeps, over rough terrain, during an extremely cold and damp winter with deep snow. On occasion he was compelled to sleep in the field and in unheated houses. While on extended active service, he was involved in several minor jeep accidents, which on one occasion caused injury to his shoulder, and on another caused injury to his ankles and knees. These accidents did not require hospitalization.
(d.) The plaintiff received the Bronze Star Medal. The Colonel commanding the 263d Infantry, plaintiff’s regiment, stated, in recommending plaintiff for this award:
No problem was too small or too obscure that did not receive his personal attention if it contributed to the comfort and well-being of the men under his care.
*406 The Bronze Star Medal Citation to plaintiff read as follows:
Major JOSEPH W. POWEES, 0483024, Medical Corps, United States Army. For meritorious service in connection with military operations against the enemy from 1 January 1945 to 8 May 1945 in Brittany, France. During this period Major POWEES served as Eegimen-tal Surgeon, 263rd Infantry, in the St. Nazaire Sector. His foresight and leadership in providing superior medical care for the regiment over an extended front aided materially in shortening the hospitalization period of members of his regiment wounded in action. His many visits to front-line positions to personally check and supervise medical installations and functions inspired confidence in the command and contributed immeasurably to the high standard of morale within his regiment. His constant concern for the welfare of all the troops under his care and his devotion to duty reflect the highest credit upon himself and the military service. Entered the military service from Eoxbury, Massachusetts.
(e) Plaintiff was also awarded the Croix de Guerre for services “exceptionnels de guerre” to the French. His other decorations were The American Defense Eibbon; Bronze Service Star for Campaign of Northern France; European Theater Operations Eibbon; World War II Victory Eibbon; Occupation Eibbon; and Combat Medical Badge.

Plaintiff’s Hospitalization September %1-Ootober 7,19I¡S

7. (a) On September 21,1945, plaintiff was admitted to the St. Victoret Dispensary in France where his condition was described as “Gastro-enteritis, acute, severe; cardiac observation; arthritis, hypertrophic, feet, bilateral.” He was immediately transferred to the 235th Army General Hospital.
(b) Plaintiff complained of:
(1) Gastro-enteritis — five days of diarrhea, frequent-water stools, lower abdominal cramps, with some feverish feeling and without any known precipitating factors.
(2) Heart Pains — three or four months of a ‘"pressing pain”, a “very bad pain” over left nipple, size of a silver dollar; a mild impairment of cardiac reserve during the last six months; a little dyspnea on climbing two flights.
(3) Bach Pains — six months, lower dorsal backache, described in one record as mild, in another as moderate, *407 worse on arising and in damp weather. Experiences it when riding in a jeep.
(4) Feet Pains — his feet were hurting him.
(c) Examination of plaintiff at the 235th Army Hospital revealed “a thin tired looking adult, somewhat tense”, not especially ill-looking. Plaintiff himself testified “I was very, very tired * * *. I went in the hospital because the war was over, and I was good and sick, and my feet were hurting me, and I felt weak. * * * I wouldn’t have gone in unless the war was over.” As a result of a physical examination of plaintiff, the examiner ruled out coronary artery disease, gout and thoracic spine pathology.
(d) An X-ray examination at the hospital of plaintiff’s thoracic and lumbo-sacral spine showed the presence of slight tipping of most of the bodies of the vertebrae as seen in an early osteoarthritis. According to this report, there were six lumbar vertebrae but no other evidence of abnormality. Examination also showed a large varicosity in plaintiff’s left leg and thigh. With these exceptions, no organic conditions were found. A G.I. series and parasite tests were normal; EKG and X-ray showed no abnormalities of the heart, and he was told informally that it was thought his pain in the chest was psychogenic. An X-ray of the feet was interpreted as normal.
(e) The hospital’s diagnosis of plaintiff was as follows:
(1) Arthritis, chronic, osteo, mild, thoracic and lumbar vertebrae, C.U. [cause undetermined] ;
(2) Physical inadequacy due to premature senility. LOD [line of duty] — one and two — yes.
(f) The diagnosis of “physical inadequacy due to premature senility” and the absence of organic causes for plaintiff’s symptoms (excepting the arthritic symptoms) suggested a psychiatric condition. However, there were no psychiatric or neurological examinations of plaintiff prior to his release from the service.
(g) At the hospital, plaintiff’s G.I. symptoms improved. Fracture boards and aspirin improved his backache a little, but not much. His left chest pain continued, but the plaintiff “depreciated its significance.”
*408 Disposition Board, October 2, 1942
8. (a) On October 2,1945, the plaintiff was presented to a Disposition Board at the hospital with the diagnosis as set forth in finding 7 (e). The Board gave the plaintiff the following profile:
P U L H E S
C 3 3 3 1 1 1 X
Duty — “C”
(b) On October 8, 1945, the doctor at the hospital who had made the diagnosis of plaintiff and directed various tests and'consultations signed Form 52C Medical Department, U.S. Army, which set forth under Diagnosis:
(1) Arthritis, chronic, osteo, mild, spine, cause undetermined.
(2) Physical inadequacy due to premature senility.
This form set forth under “Line of Duty” “1 & 2 — yes”. The form set forth under “Changed and additional diagnoses, operations, with dates”, the following:
P U L H E S
C 3 3 3 1 1 1 X
Under “Disposition” the word “Duty” appears. The reverse side of this Form 520 states, among other things:
Used as a brief consecutive record of a patient in a theater of operations and during peace-time field operations. Not to be used as a clinical history.
Also on the reverse side of the form there appears the handwritten notation “Gastro-Enteritis Ac. Sev.”
(c) Substantially the same data as to the profile “C 3 3 3 1 1 1” appears on an unsigned “Abstract Record of Hospitalization”, dated October 8, 1945, and headed “Headquarters 235th General Hospital APO 772”. The form contains no entry for several items therein, including item 5— “Complaints which have been investigated”, and item 8— “Recommended assignment limitations”.
9. (a) Paragraph 3(a) of War Department Circular 403, 14 October 1944, entitled “Physical Reclassification of Officers” provided that an officer was to be ordered before a Disposition Board when his commanding officer believed he was *409 “permanently incapable oí performing the duties of his position because of physical incapacity.* * *”
(b) Paragraph 4 of W.D. Circular 403 provided as follows:
Upon completion of observation and treatment at a medical facility authorized the prerogative of physical reclassification, a disposition board will make appropriate recommendation for disposition of the officer as follows:
a. To return to duty for general military service.
b. To return to duty for general military service, with waiver of a physical defect non-progressive in cnarac-ter and of such a slight degree as not to affect adversely performance of full duties appropriate to the officer’s grade and branch.
c. To return to duty in a limited-service status provided the officer is physically capable of efficient performance of limited-service duties and is—
(1) Currently in a general-service status but temporarily capable of only limited-service duties. Such assignment to temporary limited service will not exceed 6 months. The board will recommend the date when the officer will revert automatically to general-service status or to the date on which he will return to a medical facility for final disposition.
(2) Currently in limited- or general-service status but capable of performing permanent limited service provided that the physical incapacity is nonprogressive in character, and the commanding general of the major command or defense command having assignment jurisdiction over the officer certifies that a position vacancy in grade exists for the officer in a military occupational specialty (MOS) for which he is qualified, and that his assignment is considered essential. If the commanding general is represented at the medical facility by a liaison officer, the disposition board proceedings will be referred to this liaison officer for certification as to whether or not a suitable assignment exists. In other cases the disposition board proceedings will be forwarded for such certification to the headquarters of the major command or defense command concerned. Use of airmail is authorized for this purpose.
d. To appear before an Army retiring board. Such recommendation will be made when the medical disposition board determines that one of the following circumstances exists:
*410 (1) An officer currently in a general-service status is considered permanently physically incapacitated for all military service.
(2) An officer currently in a general service status is considered physically incapacitated for general military service but physically qualified for limited military service, provided his services have been certified as not essential under provisions of c (2) above.
(3) An officer currently in a limited service status is found to—
(a) Be physically incapable of performing limited service in an assignment commensurate with his grade and branch.
(b) Be physically qualified for limited service but whose services have been certified as not essential under provisions of c (2) above.
(4) An officer about to be relieved from active duty and already in a retired status by reason of a physical disability is found to have aggravated, while serving under temporary appointment in a higher grade, the physical defect for which he was previously retired or to have incurred an additional permanently incapacitating defect.
(5) An officer about to be relieved from active service and already in a retired status for reason other than physical disability is found to have a physical defect which is permanently incapacitating for the physical classification in which he is currently serving.
(6) An officer currently in a limited service status, and about to be separated from active service, is found to—
(a) Have a defect for which he was previously classified as limited service and such defect has become markedly aggravated, or
(b) Have an additional defect which is permanently incapacitating.
(7) An officer about to be separated from active service certifies to have incurred or to have aggravated in active military service a physical defect which is permanently incapacitating.
10. War Department Supplement to MK.1-9, 30 June 1945, entitled “Physical Profile Serial” sets forth the description and explanation of the profile system in effect in September *411 and October 1945.[1] The profile system, begun by the Army in 1943, is a method of physical classification based upon the function of various organs, systems and parts of the body. The body is divided into six categories (called factors) designated by the letters “PULHES” in which “P” stands for physical capacity or stamina; “U”, upper extremities (functional use of hands, arms, shoulder girdle and spine); “L”, lower extremities (functional use, strength, range of motion and general efficiency of feet, legs, pelvic girdle and lower back or sacral spine); “H”, hearing; “E”, eyes; “S”, neuro-psychiatric. There are four grades in each of the six categories or factors. Paragraph 4a provides:
Individuals with a physical profile serial containing all numerals 1, 2, or any combination thereof, will be considered physically qualified for general military service. If a profile contains a three or is comprised of all threes, it is considered that this individual meets the requirements for limited military service, as prescribed in MR1-9. If the profile serial contains the number four, it indicates that this individual has a defect that is not acceptable for military service under the provisions of MR1-9.
The letter “C” in the profile represents “An individual with a profile serial with the numeral 3 as the lowest grade in any factor.” The letters are used for statistical assignment and reporting purposes only. The letter “X”, used as a suffix, indicates overseas service.
11. Plaintiff’s Army file contained no record of a formal reclassification to limited service by the Disposition Board. However, in light of the foregoing considerations, it is concluded that when the Disposition Board profiled the plaintiff “C 3 3 3 11 1X, Duty C”, it found, in effect, that he was not physically qualified for general military service, but met the requirements for limited military service. In plaintiff’s case, the disqualifying factors were his physical capacity or stamina (including strength, agility, energy and similar *412 factors), upper extremities (including the functional use, strength, range of motion and general efficiency of the hands and thoracic spine) and lower extremities (including the functional use, strength, range of motion and general efficiency of the feet and lower spine). The letter “C” and “Duty C” indicated he was to receive an assignment suitable to limited service. The letter “X” showed that he had overseas service.

Plaintiff's Duty Assignment Subsequent to Hospitalisation

12. When plaintiff was discharged from the hospital on October 8, 1945, he was assigned to a regiment in the 42d Division inasmuch as the 66th Division to which he had previously 'been assigned had been de-activated. He was not given the duties of a Regimental Surgeon but rather was assigned duties of a far less strenuous nature and was told not to do much. As a Regimental Surgeon he had nine officers and 126 men under his command and was responsible for the health of a regiment of 3,000 men. 'See finding 6(b). His duties while with the 42d Division were to take care of an old, but not invalid, French chaplain, and to supervise the disinfection of displaced persons.

Terminal Physical Examination; Release from Active Duty, Appointment in Officers' Reserve Corps

13. (a) On February 24, 1946, plaintiff departed for the United States for demobilization. He arrived in the United States on March 5,1946, and on March 8,1946, he was given a terminal physical examination at the Fort Devens Separation Center, Massachusetts, for relief from active duty. On March 9,1946, he was ordered, effective March 10, to terminal leave until May 26,1946, at which time he was released from active duty under demobilization and not by reason of physical disability.
(b) The terminal physical examination at the Separation Center on March 8 was very perfunctory and extremely brief, taking but a few minutes. A large number of officers were being examined, all of whom, including the plaintiff, were in a hurry to get home.
*413 (c) The report of plaintiff’s terminal physical examination contains plaintiff’s history of diarrhea, back, arm and chest pains, and of osteoarthritis of the low thoracic vertebrae. The report showed that plaintiff still complained of Ms back pain, and also set forth that plaintiff had the year before noticed a slight tremor of his right hand on motion wMle eating, for which he had not been hospitalized. It also showed that plaintiff had varicose veins, moderate bilateral and a moderate varicocele left. The report found plaintiff normal neurologically and psycMatrically. The report concluded that plaintiff was not permanently incapacitated for general service.
There was no reference in the terminal physical examination report to the Army General Hospital’s diagnosis of physical inadequacy due to premature senility or to plaintiff’s low profile. There was no re-examination or X-ray to confirm or disprove the hospital’s diagnosis of osteoarthritis and no diagnosis with respect thereto was given in the terminal physical examination report. The report did not recommend that, plaintiff be re-profiled at an appropriate medical facility and plaintiff was not re-profiled. No neurological or psychiatric examination was given, and there had been none in the Army.
(d) Plaintiff’s “Separation Qualification Record”, which is furnished each veteran for use to obtain civilian employment or in any other way that may prove beneficial to him, recorded all Ms authorized ribbons and contained the following statement with respect to plaintiff’s title, description and related civilian occupation:
Regimental Surgeon, Commander (3500)
Was responsible for training of nine officers and 126 enlisted men, commanded regimental medical detachment in combat. Was commended by Corps, while on service in United States. Was awarded Bronze Star in France for meritorious acMevement in combat, (G.O. #60 Headquarters 66 Division). Responsible for health of entire regiment, treatment of sick and wounded in combat. Assisted attached French troops. Was recommended for Croix de Guerre by General of French Army. Received consistently “superior” ratings in above position.
(e) For the period from January 1,1945 to June 30,1945, covering his period of combat with the 66th Division and as *414 Regimental Surgeon, plaintiff received an efficiency rating of 5.7 “Superior”. For tire succeeding period from July 1, 1945, to December 1945, bis efficiency report was 4.0.
14. War Department Circular 61, 2 March 1946, was issued for the purpose of offering commissions in the Officers’ Reserve Corps to all non-regular AUS officers released after World War II service. The circular provided that all such commissioned officers who, upon relief from active duty, were found physically qualified for general service, limited service or general service with a waiver, were to be offered commissions in the ORC commensurate with their commissions in the AUS. More particularly, this circular provided to the extent relevant:

Appointment or Enlistment in the Organized Reserves of Military Personnel on Relief from Active Duty except Officers of the Regular Army and Enlisted Men of the National Guard. * * *

3. At the time of issuance of orders for relief from active duty all officers in the Army of the United States except officers of the Regular Army active or retired, will be offered appointments in the Officers’ Reserve Corps for an initial period of 5 years in the highest grade held at the time of relief from active duty subject to the following provisions:
a. All male commissioned officers of the Army of the United States except active or retired Regular Army officers, found physically qualified for general service, limited service, or general service with waiver, who have served honorably and who have not been separated for unsatisfactory service, are eligible for appointment * * *
* * * * *
9. Administrative procedures involved in the appointment * * * of these individuals in the Officers’ * * * Reserve Corps will be as prescribed in AR 140-5 and AR 150-5, as changed, except that in the case of conflict between those regulations and this circular, this circular will govern.
10. The Commanding Generals, Army Service Forces, will take the necessary action to implement this policy and to include in the administrative machinery of the various separation centers sufficient qualified personnel to explain the provisions of these policies to those concerned and to accomplish the necessary administrative procedures.
*415 17. Physical examinations given upon separation from active service will form the basis for determination of physical fitness for the purposes of this circular.
18. All concerned will give the maximum publicity to this policy.
15. (a) Contemporaneously with his relief from active duty, plaintiff on March 10, 1946 signed a completed application form (Form 170-1) for original appointment as a Major, Medical Corps, OEC, in which he certified that the information contained therein with respect to the 23 items listed was correct to the best of his knowledge. In response to item 22 “General or Limited Service At Time of Separation”, an “X” was typed in the box captioned “General”. Accompanying plaintiff’s application for appointment as a Major in the Officers’ Eeserve Corps was the report of his terminal physical examination conducted on March 8, 1946.
(b) Also on March 10, 1946, plaintiff’s application for original appointment in the grade of Major, OEC, was accepted. On the same day he was tendered and accepted the appointment and signed the Oath of Office.
16. On May 11,1946, plaintiff was promoted to Lieutenant Colonel, Medical Corps, AUS, which was a terminal leave promotion which required neither acceptance nor oath nor physical examination and was automatically conferred unless declined in writing.
17. Subsequently, on January 8, 1947, plaintiff was promoted to the grade of Lieutenant Colonel in the OEC, this being accomplished without a further physical examination inasmuch as the examination of March 8, 1946 was within one year of the date of promotion.[2]

Plaintiff’s Pre-service Condition and Condition Prior to Overseas Service

18. (a) Prior to the time plaintiff was sent overseas, he was in excellent health and physical condition. He had been examined in June-July 1942 for appointment to office and for entry on active duty and had been found fit for general military service. Despite strenuous combat infantry train *416 ing, lie had no illness with the exception of an attack due to food poisoning caused by eating bread pudding and sauce at an Anny mess hall at Camp Robinson. The December 1948 medical record at the Camp Robinson Station Hospital, where he was treated for the food poisoning, contained the entry that he had no previous gastro-intestinal upset. Apart from the food poisoning, he did not complain of any pains.
(b) He was a man of great energy and drive. His mental drive was manifested by a single-mindedness of purpose in achieving, against great odds, his ambition to become a doctor.
(c) He was vigorous and strong. Also, he was an ardent proponent of athletics and acted as an advisor for, and participated in, young persons’ local baseball and football activities.
(d) He was a very friendly and outgoing type of person, amiable, hospitable, jovial, likeable, smiling and witty.
(e) He was very alert mentally, enthusiastic, fluent of speech, and stable.

Plaintiff’s Condition at Timo of Release

19. (a) When plaintiff was released from active service, a great change had taken place in his physical and mental condition. He felt tired and exhausted, and nervous; he didn’t care what happened; and he had pains in his back, feet and chest.
(b) His wife (a registered nurse) testified[3] that when he arrived home from the Separation Center and “* * * I got a good look at him in the house, I was just heartbroken, because he had gotten so thin and old in two years that you wouldn’t know it was the same person, shaky and oh, just a mess.”
(c) He looked “like a shell of what he had been formerly” and appeared to have aged greatly. He was baggy under the eyes, had lost much weight and seemed exhausted and worn out.
(d) In contrast to his former energy and strength, he appeared weak, greatly fatigued and lacking in stamina, and he moved like a much older person.
*417 (e) He liad lost Ms drive and interest in sports. He did not want to carry on any conversation. He was “unconcerned” and could not push, himself. The “spark” seemed to have gone; he was withdrawn and paid no attention to what one said to him. Pie could not concentrate. He was somewhat confused and disoriented. He spoke very slowly and guardedly and was very much less articulate than he had been.
(f) His personality had drastically changed. He had become very nervous, paced around a good deal, and he was very short, irritable and quick to take offense. He was no longer a jovial person hut a sober one. He had been an extremely observant Catholic, but after his discharge gave up church attendance. On several occasions, however, he went to retreat to gain peace of mind.
(g) He complained of much pain and discomfort in his chest, back, shoulders, ankles, hands, knees, and feet. He had tremors in Ms right hand.
(h) He continued to suffer from a severe pruritus ani[4] which had begun in 1943 or 1944 and caused a great deal of insomnia. He suffered from migraine headaches.
(i) He did not exaggerate his symptoms.
(j) Plaintiff’s wife and friends were very much concerned about his health.

Plaintiff’s Condition Subsequent to Release

20. (a) Plaintiff’s symptoms have persisted ever since his release from active duty. He continued to appear older, by some 10 to 20 years, than his actual age. He continued to present a worn-out appearance; his eyes remained puffy with dark circles.
*418 (b) He continued to feel very tired. In July 1948, when plaintiff was at Camp for two weeks of training duty, he had obvious lack of stamina, felt poorly and complained of being easily fatigued. He was then underweight and had to receive a waiver for underweight and varicose veins, left leg, to qualify for this two weeks of training duty. The YA examiner in 1950 described him as a “pale, tired appearing old man — extreme fatigue.” In 1954, he still complained of general weakness, always tired, chronic fatigue and the YA examiner stated that he appeared “tired”.
(c) He lacked energy, drive and ambition. He could not finish medical courses which he undertook. He did not appear to care much about anything. His wife and a friend, who was a doctor, tried to prod him into greater activity without success. He had to lie down and rest a good deal during the day.
(d) He continued to lack concentration. His expression was blank. His nervousness persisted, as well as his irritability.
(e) The pains continued in his chest and heart; in his shoulders, ankles, hands, knees, feet, joints, and back.
(f) The tremors persisted. Also, despite all treatment, the pruritus ani, with resulting insomnia, persisted; and the migraine headaches continued unabated.

Plaintiff’s Medical Practice Subsequent to Release

21. (a) Due to his disabilities, plaintiff’s medical practice had to be substantially curtailed. Prior to his entry on active duty in 1942, he had engaged in the general practice of medicine for approximately two years, and was extremely ambitious in trying to build up his practice. In addition to having standard office hours of four hours per day, five days a week (from 2:00 p.m. to 4:00 p.m. and 1:00 p.m. to 9:00 p.m.), he worked far more than these hours in making house calls and hospital visits, without limitation, day or night. Also, he did not limit himself in the types of patients or illnesses he treated.
(b) Upon his return from the service, he was unable, because of his condition, to resume practice for the first three or four months. He looked so worn out when he returned *419 from the service that his wife did not want to ask him to go ahead and do any work. However, both thought he would improve and he reopened his old office at his home in Rox-bury. When he tried to carry on a normal practice, he was unable to do so. He had no stamina. He could not arise in the morning and had to rest frequently. Although he worked only four hours per day, four days a week (during which he maintained office hours of from 2-.00 p.m. to 4:00 p.m. and 7:00 p.m. to 9:00 p.m.) and on Saturday mornings, he still had to rest before dinner, after the two hours of afternoon office hours, and after dinner, prior to the two-hour evening session. Most of plaintiff’s other time was spent in sleeping or resting.
(c) He frequently refused to take telephone calls from patients. He made few. house or hospital calls, and these aggregated not more than one or two per week.
(d) He turned down many patients and referred a considerable number to other doctors. The VA had an authorized fee-basis physician arrangement under which private civilian doctors would examine veterans, with the VA authorizing payment. Plaintiff in February 1947 rejected an offer to handle cases for the VA under this program, stating he was not up to it.
(e) Notwithstanding the effort of his wife and a doctor friend to prod him into greater activity (see finding 20 (c)), he could do no more. In 1950 his wife thought it might help him if he moved out of his house in Roxbury, while continuing to maintain his office there. In that year they bought a pleasant, old house in Newton, some eight miles away from his office in Roxbury, which they had to sell about a year and a half later because the plaintiff was too tired physically to commute back and forth.
(f) In the period from 1963-64, he did some contract work for the National Guard, which involved giving an average of 7 to 8 general physical examinations a month to recruits.
(g) To augment his income, plaintiff’s wife was instrumental in having him apply in July 1963 for a part-time position as a Medical Officer with the Boston Post Office Department, which position required a tour of duty of four hours per day (from 4:00 p.m. to 8:00 p.m.) for five days per week *420 at $4.25 per hour, based on an annual salary for full-time work of $8,840. The duties of this position were to examine applicants for Post Office employment and to administer first aid. Although plaintiff had had approximately 25 years of experience beyond his internship, the position for which he applied was one for which doctors with none to four years of practice after internship were eligible. The Civil Service Commission announcement for appointment of Medical Officers stated in part:
Physical Abilities. — Applicants must be physically able to perform efficiently the duties of the position, which are described elsewhere in this announcement. Good distant vision in one eye and ability to read without strain printed material the size of typewritten characters are required, glasses permitted. Ability to hear the conversational voice, with or without a hearing aid, is required. In most instances, an amputation of arm, hand, leg, or foot will not disqualify an applicant for appointment, although it may be necessary that this condition be compensated by use of satisfactory prosthesis. Applicants must possess emotional and mental stability. Any physical condition which would cause the applicant to be a hazard to himself or to others will disqualify him for appointment.
(h) In applying for a federal position as a Medical Officer, plaintiff claimed and received a 10-point veterans’ disability preference (see findings 24(a)-(1), infra) and was found eligible for appointment as a Medical Officer (1) in the Department of Health, Education and Welfare for a part-time position of 20 hours per week, with the salary pro-rated on the basis of $10,130 per annum; (2) at the Boston Army Base, which job paid $10,420 per annum but was not to be filled at that time; and (3) at the Boston Post Office for 20 hours weekly, Monday through Friday, 4:00 P.M. to 8:00 P.M., with a salary of $4.25 per hour. On October 28,1963, plaintiff declined an appointment to the HEW and on the same day, pursuant to his certification as eligible for appointment to the Post Office, he underwent a physical examination for that job which was conducted by a medical examiner of the United States. The Certificate of Medical Examination for that appointment filled out by the plaintiff stated that he had a service-connected, combined 60% disability rating for *421 “nerves” and “osteoarthritis”. The examining physician found, among other things, that plaintiff had no residuals of previous mental or nervous illness; that he had mild varicose veins in the left calf; and that the plaintiff was “abnormal”, showing a “history of osteoarthritis, 30% disability”, and of “nerves, 30% disability”. The examining physician concluded that plaintiff was “well able to do the work of a postal doctor.”
(i) Plaintiff was given a 10-point veterans’ disability preference for the Post Office and other federal positions set forth above under the general policy of the government to employ handicapped or disabled persons and to give disabled veterans a preference. Plaintiff received the 10-point preference under Subchapter 1 of the Federal Personnel Manual which provided:
An ex-serviceman is entitled to 10-point (disability) preference when he: * * * (2) Has an existing service connected disability; or receives compensation, pension, or disability retirement by reason of public laws administered by the Veterans Administration or by a branch of the Armed Forces.
(j) The Manual also provided for waiver of physical requirements of a veteran eligible for preference. Under the policy favoring the disabled, the applicant was required to have only the minimal physical capacity necessary to perform his particular position properly, efficiently and safely. The physical standards were “realistic” based on minimal physical qualification necessary for adequate and safe performance. No federal agency has the power to determine that an applicant does not meet the physical qualifications; only the Civil Service Commission may make such a determination.
(k) It was under the above physical standards that plaintiff was found by the examining physician, as previously set forth, to be “well able to do the work of a postal doctor.” Plaintiff declined the Post Office position because the hours prescribed therefor — from 4:00 P.M. to 8:00 P.M. — would have precluded him from continuing both his afternoon and evening office hours.
(l) During the two-year period prior to 1942 (when he went on active duty), plaintiff was starting his medical prac *422 tice and realized a gross income of about $6,000 a year. Since bis release from active duty in 1946, bis total income bas been $7,000 to $8,000 per year. This income was not only for the services of plaintiff, but for the substantial help of his wife, a registered nurse and graduate of Boston University in Biology, who worked in plaintiff’s office in place of a salaried girl. The major reason for this comparatively low-income level has been plaintiff’s inability, because of his extreme fatigue, to take care of all the patients desiring his services.

Plaintiff’s Military Service Subsequent to Release

22. (a) Plaintiff has had no actual military service since his release with the exception of three weeks of active training duty, July 10-24, 1948 and October 10-17, 1948. The July 10-24 tour of duty was with the 26th Infantry Division, Massachusetts National Guard, at Camp Edwards, Massachusetts, Special Troops, with an MOS of No. 3100, i.e., Medical Officer, General Duty. He had no field duty, but rather served at the dispensary and sick call, and examined boxers in the recreational program.
(b) For his tour of duty, plaintiff was given a physical examination at the Williams Hospital, Camp Edwards, on July 12,1948, two days after he began to serve. The report of examination found that he had pruritus ani, severe; varicose veins, left leg, moderately severe; and was underweight. The report found that he was normal neurologically and psychiatrically, although no neurological or psychiatric examination was given. On the basis of the physical examination, plaintiff was found permanently incapacitated for general service as a Reserve Officer by reason of “varicosity, left, greater saphenous, moderately severe.” He continued to serve out the tour of duty, however, and some three months after its termination, on October 6, 1948, the Headquarters of the First Army, Office of Surgeon, found him physically qualified for the tour, with waiver for underweight and varicose veins, left leg.
(c) Dr. James M. McNulty, a surgeon, who was in charge of the 26th Infantry Division Medical Detachment during plaintiff’s July 10-24, 1948 active duty training, testified *423 that plaintiff complained of soreness and stiffness of back, shoulders and hands, particularly in the morning, upon arising; felt poorly, easily fatigued, obviously lacked stamina, and presented a worn-out appearance. As an Army medical officer who had served during World War II, in a general hospital and on medical boards on a few occasions, Dr. McNulty testified that plaintiff was not, in 1948, physically qualified for general service, including field duty, and that, if plaintiff had the same symptoms in 1946, he was not qualified for general service then.
(d) Plaintiff’s one-week tour, October 10-17, 1948, consisted of attending a class at the Army Medical Center, Washington, D.'C., on the medical aspects of atomic explosion. In connection with this tour of duty, plaintiff, having been found by the Army fit for service (see finding 22(b)) and willing to serve as long as the Army desired his services and considered him physically qualified, executed a certificate in lieu of physical examination which read in part:
I now consider myself sound and well and physically qualified for full military duty. I was considered physically qualified for military service at the time of accomplishment of last physical examination on or about July 1948 at Boston. To the best of my knowledge and belief, I have no physical defects or conditions, except as noted below, which would preclude the performance of full military duty.
[No exceptions noted.]
(Signed) Joseph W. PoweRS,

Lt. Ool. M.O. (Bes.).

In November 1948, the month following his one-week tour of duty in Washington, D.C., plaintiff filed an application with the Veterans Administration for disability compensation in which he claimed various specified ailments. See finding 23 (b), infra.
(e) On July 18, 1949, plaintiff was transferred to the Inactive Deserve Group, OK.C, for failure to answer the officer survey questionnaire and on December 22, 1952, he was discharged from his commission for failure to respond to correspondence in April 1951 and November 1952 on the ORC service evaluation program.
*424 Application to the Veterans Administration, November 19J¡8
23. (a) When plaintiff was released from active service, he did not wish to apply for VA disability, thinking that while he was sick, he could get well. His wife also believed that his condition would improve. As his condition persisted, in February 1947 his wife and a friend, Paul J. Sullivan— a representative of the Disabled American Veterans, who presented claims for disability compensation on behalf of veterans — urged plaintiff to file a claim with the Veterans Administration, but the latter would have nothing to do with it. Plaintiff testified, “I did not want to apply. Just like the reason I got in the Army. I didn’t want anything from my Government. And I had some pride and I still have some.” Also, plaintiff did not believe that a doctor should have a disability or get a pension, and he would not admit to himself that there was anything wrong with him. Later in February 1947, Mr. Sullivan went to plaintiff’s home and with the help of the latter’s wife prevailed upon him to answer the questions on a VA application form for disability compensation, which Mr. Sullivan filled in. At plaintiff’s request, Mr. Sullivan left with him the filled-in form and another application, which application plaintiff, at the urging of his wife, eventually completed and filed with the VA on November 24,1948.
(b) In his application for disability compensation, plaintiff based his claim upon osteoarthritis in both feet and back, bilateral varicose veins, migraine, pruritus ani, gastroenteritis, varicocele, premature senility, psychoneurosis, moderately severe, and fractured ankle. He stated that while in the service he had received treatment for arthritis of the feet at Camp Blanding; for gastroenteritis at Camp Kobinson, Arkansas, in 1944; and for osteoarthritis of back, premature senility, psychoneurosis, moderately severe, and varicose veins in France.
(c) The word “psychoneurosis” does not appear at any place in plaintiff’s Army medical records received in evidence in this case. The record shows, however, that the Army doctors in France told plaintiff informally that they thought his chest pains were psychogenic. See finding 7(d). The *425 record also indicates that because of this and because of his multiple complaints without organic cause plaintiff suspected he had a neurosis but was ashamed previously to admit it.
Examinations and Ratings of the Veterans Administration, 1948-im
24. (a) Plaintiff was given thorough examinations by the Veterans Administration on March 23, 1949, April 13, 1950 and May 11,1954.
(b) These were the first complete examinations plaintiff had. The Army had never given him a neurological or psychiatric examination as did the Veterans Administration beginning with the first examination in March 1949.
(c) Plaintiff evidenced the following complaints in connection with the first examination in March 1949: sharp pain over heart and shortness of breath on extra exertion; pain in chest; terrible pruritus ani for which nothing helped; restless sleep due to pruritus ani; migraine headaches accompanied by scotoma, blurred vision, nausea and vertigo; ringing in ears; aches and pains of the joints; backache; very irritable; pain in both ankles and great toes.
(d) At the 1949 examination, the medical examiner found the following: blank expression; appears at least 10 years older than stated age; does not exaggerate his symptoms; appears to be tired; puffiness beneath his eyes. A complete neurological examination revealed the following: tremors of the eyelids and extended fingers; intention tremor on finger-to-nose and finger-to-finger tests; positive Hoffman, right; all deep reflexes hyperactive.
The neurological diagnosis was moderate degree of incapacity by reason of psychogenic somatization reaction, manifested by multiple somatic complaints, pruritus ani, joint aches and pains, chest pain, shortness of breath, etc.[5] The diagnosis also stated:
External precipitating stress: Moderate. 4 years of Army regimentation, 16 months in ETO, 6 months in combat.
*426 (e) The 1950 YA examination of plaintiff reflects the following : He was subjected to horrible and unpleasant sights in combat; pruritus ani since 19-43, severe; varicose veins; appears to be 20 years older than stated age of 46; pale, tired-appearing old man; wealth of somatic complaints; terrible headaches; blurred vision; spots; pruritus ani keeps him awake at night; lazy, not much pep; does just enough work to keep alive; has dizzy spells; fears he has Parkinson’s syndrome because of twitching fingers; joint aches and pains, cardiac pain, precordial distress; shortness of breath and startled reaction; can’t take care of patients because of extreme fatigue and headaches.
The final neurological diagnosis in 1950 was a moderately severe degree of incapacity by reason of psychogenic soma-tization reaction, chronic, moderately severe. The diagnosis also stated:
External precipitating stress: severe, 16 months overseas in the ETO, in combat most of the time; chronic migraine headaches.
(f) The 1954 YA examination contains items comparable to those contained in the 1949 and 1950 examinations. The neurologist who examined plaintiff a't this time rendered a diagnosis of “Anxiety reaction; chronic, moderately severe to severe; competent.”
(g) Based upon the findings and diagnoses of the March 1949 examination and plaintiff’s Army medical records, the YA determined that plaintiff’s disabilities were service-connected and rated them as follows under the YA Schedule for Batmg Disabilities (1945 ed.):
(1) 30 per cent for osteoarthritis, generalized, dorsal and lumbar spine, both ankles and feet. (Diagnostic Code No. 5003) [6]
*427 (2) 30 per cent for psychogenic somatization reaction with multiple somatic complaints, pruritus ani and migraine. ('Diagnostic Code No. 9104)[7]
(3) 10 per cent for varicose veins, left lower extremity, symptomatic.
The individual ratings totaling 70 per cent were combined under par. 25 of the VA Schedule to 60 per cent.
(h) The VA schedule divides “Psychiatric conditions” into two general classes: “The Psychoses” which include Diagnostic Code Nos. 9,000-9,055, and “The Psychoneuroses” which include Diagnostic Code Nos. 9100-9112. Diagnostic Code No. 9104 which the VA applied to plaintiff is listed under “The Psychoneuroses”.[8]
(i) Plaintiff was first admitted to a Veterans Plospital on November 28, 1956, from which he was discharged on December 7, 1956. At that time his chief complaint was shoulder, knee and finger pain. He was discharged with a final diagnosis of osteoarthritis, treated, improved; and an undiagnosed disease of joints observed for rheumatoid arthritis, treated, improved.
(j) The 60 per cent combined disability rating was effective as of the time of the filing of plaintiff’s application on November 24, 1948. Based upon the subsequent examinations, this rating has been continuously confirmed by the VA and the same ratings were in effect in April 1958 and October 1963.
(k) Veterans Administration disability ratings measure the individual’s percentage of impairment of earning capacity in civil occupations. As stated in the Schedule, par. 1, entitled “Essentials of Evaluative Eating”:
The percentage ratings represent as far as can practicably be determined the average impairment in earn *428 ing capacity resulting from such, diseases and injuries and their residual conditions in civil occupations . . .
(1) The diagnoses of the Veterans Administration upon which the ratings were predicated were the result of studies of plaintiff’s history, complaints, physical examinations, neurological and neuropsychiatric examinations, tests and X-rays.

Summary of Regulations Establishing Physical Standards for Disability Retirement

25. (a) At the time plaintiff was relieved from active duty, there were in effect a number of regulations which established standards, both general and specific, to determine physical or mental incapacity for the purpose of disability retirement.
(b) The regulations which incorporated the general physical standards for disability retirement provided that an officer was incapacitated for active service if he were permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war.[9] The regulations further provided that incapacity for active service is a permanent condition resulting from an incurable disease, injury or infirmity of such a character as to prevent the reasonable fulfillment of his office in peace and war.[10]
(c) The regulations defined a permanent disability as one the removal of which in a reasonable time is highly improbable.[11]
•(d) “Active service”, under the regulations, meant “general” service as distinguished from “limited” service, and the fact that an officer could perform limited military service with the supply arms and services did not prevent his retirement for disability.[12]
(e) The specific physical standards for performance of military service were set forth in AE 40-105, October 14,1942. *429 This regulation prescribed standards for the commissioning of officers, but the standards therein were used for all purposes, including retention for active service and relief therefrom.[13]
(f) With respect to retention, TM 12-245, par. 2a provided that the physical standards of AE, 40-105 were not to be as strictly interpreted as for appointment. In this connection, TM 12-245, par. 60a (2), further provided that “officers may be found capable of performing active (general) service even though they have diseases, injuries or infirmities which would disqualify them for original appointment, provided such diseases, injuries or infirmities are of such a nature and degree as not to affect adversely the performance of active (general) service (including overseas duty) considering the individual’s age, grade, branch and military occupational specialty [with] [appropriate consideration * * * also [to] be given to a record of satisfactory performance of general service over a reasonable period of time.”
(g) AE 40-105, October 14, 1942, the regulation which established the specific physical standards, provided that an officer was not qualified for active service if he had osteoarthritis of the spinal column; disease of the sacroiliac or lumbo-sacral joints; diseases of the bones or joints; psychoneuroses ; or marked muscular tremors. Par. 50 of AE 40-105 provided that “For the safety, efficiency and economy of the military service it is highly essential that individuals with nervous and mental diseases be excluded.” Par. 51 of this regulation prescribed a minimum neurological examination to ascertain nervous and mental conditions. Such an examination was not conducted by the Army prior to plaintiff’s release.
(h) AE 40-100, April 8,1946, provided that osteoarthritis from any cause (par. T (b) (2) (i)) and psychoneurosis of any degree if it has been recurrent or has shown symptoms within the preceding five years (par. 1 (b) (2) (t) ) were disqualifying for original appointment or extended active duty in a limited service status.
*430 Proceedings Before Army O orreotion B oard, 1958-59
26. At the time he was separated from active duty, plaintiff was not advised by the Army about his possible right to disability retirement. He had no knowledge of such possible right until some years later when Mr. Sullivan of the Disabled American Veterans spoke to plaintiff’s wife about plaintiff’s putting in for retirement. However, the plaintiff would not do it, since he was ashamed of his condition. Finally, Mr. Sullivan spoke to Mr. Francis Henry, a Washington representative of the American Veterans of World War II (AMVETS) about the matter, and plaintiff in 1958 eventually agreed to apply for correction of his military record to show that he was retired by reason of physical disability as of May 26, 1946, which application was filed on May 22,1958.
27. A hearing was held on January 14, 1959, before the Army Board for Correction of Military Becords, at which plaintiff was represented by Mr. Henry of AMVETS.
28. The following evidence was before the Army Correction Board:
(a) The medical records of the Army and Veterans Administration.
(b) The following documents from the Army and VA files which were submitted by the plaintiff as exhibits: The VA examination of March 23, 1949; the VA ratings and diagnoses; and The Bronze Star Medal Citation.
(c) The testimony of the plaintiff and Mr. Sullivan.
(d) An affidavit of the plaintiff and written statements of Colonel Edward J. Higgins (USA Bet.), Major Edward W. Byrnes (MPC-USAB), and Dr. James M. McNulty. Colonel Higgins, a former director of personnel at Fort Devens, stated that he knew plaintiff for 25 years; that prior to his service he was a vigorous and very healthy individual; that on his return from active duty he noted the changes in his physical appearance and the lack of agility and drive that he had formerly possessed; that in his considered opinion plaintiff was physically handicapped by his military service; and that “it certainly seems to be permanent”.
*431 Major Byrnes wrote that he knew plaintiff for over 30 years; that he had found him to be an honorable gentleman at all times; that prior to his service he was alert, energetic, a great proponent of athletics and a participant therein; that upon his return to civilian life it was easy for someone who had known him previously to see the great change that had taken place in him; that he had lost the energy and drive that had formerly characterized him; that he had lost his interest in sports and other activities that had formerly constituted a good part of his life; that his appearance had altered greatly; that he appeared older and was very nervous; and that his disposition had changed from great amiability to pronounced irritability.
Dr. McNulty’s written statement to the Board was similar to his later testimony at the trial of this case. See finding 22(c).
29. The foregoing evidence before the Army Correction Board showed the following:
(a) Plaintiff’s excellent physical and mental condition at the time he entered service.
(b) His arduous duties in training soldiers for combat.
(c) His extreme devotion to duty and arduous combat service.
(d) His symptoms and hospitalization in 1945 and the diagnosis of osteoarthritis, physical inadequacy due to premature senility, and varicose veins.
(e) His Disposition Board in 1945, its profile findings which showed that he was not physically qualified for general military service, but met the requirements for limited service, and his assignment to less strenuous duties. See findings 11,12.
(f) His final terminal physical examination at the Fort Devens Separation Center and the perfunctory and extremely brief nature thereof.
(g) His appointment to the OBC at the time of separation ; his active duty training for 1948 and attendant physical examination and subsequent waiver; his certification that he considered himself physically qualified for full military service and his inability to perform general active service in his two short tours of training duty in 1948.
*432 (h) His disabilities at and subsequent to release, and Ms inability to maintain a normal medical practice.
(i) The VA examinations and continuous, combined 60% disability rating from the time he applied in 1948 and the fact that these were the only neuropsychiatric examinations plaintiff had, the Army having failed to provide them.
(j) The regulations establishing entitlement to disability retirement if the officer was permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war.
30. Prior to the hearing in the matter, the Correction Board on July 23, 1958 requested the Surgeon General’s Office to review plaintiff’s application, together with his military and medical records and to furnish the Board a comprehensive opinion for its guidance regarding the medical issues raised by the plaintiff. In response, on July 31, 1958, the Surgeon General’s Office submitted an opinion to the Board which read as follows:
1. Records in the case of Joseph W. POWERS, 0 483 024 have been received in this office.
2. TMs former Lieut. Colonel, Medical Corps, had 4 years active duty including WWTI combat, was hospitalized twice while in service for relatively mild, nonspecific symptoms, was treated symptomatically and received a routine separation being obviously physically qualified for further military service. Subsequent to separation an osteoarthritis wMch had been noted as developing while in service gradually progressed as is expected m the aging process and symptoms of an anxiety reaction in combination with other manifestations of advancing age have appeared in this applicant’s 5th decade. The compensation awarded by the YA for these conditions, including varicose veins, has no relation to his fitness for duty in 1946 and the development of disorders subsequent to service does not qualify the applicant for disability retirement benefits.
3. It is the opinion of this office that the record fails to support applicant’s contention of error or injustice in the medical aspects of his separation in 1946 and that he presented no physical or mental disability which would have warranted his retirement for physical disability under the rules, laws, regulations or policies in effect at that time.
*433 31. On January 14,1959, the Correction Board concluded that “it concurs in the opinion of the Surgeon General’s Office to the effect that the applicant’s failure to be relieved from active duty on 26 May 1946 by reason of physical disability, with entitlement to retirement pay, is neither erroneous nor unjust.” The Board recommended denial of plaintiff’s application for correction of military record.
32. On February 6,1959, the Under Secretary of the Army notified the Adjutant General that he had approved the Correction Board’s recommendation to deny plaintiff’s application and plaintiff was notified of the denial on April 21,1959.

Medical Testimony at Trial

33. (a) Plaintiff presented as an expert witness, Dr. Hyman D. Shapiro, a psychiatrist who is presently in private practice in Washington, D.C., and also serves as psychiatrist and neurologist for the Board of Police and Fire Service for the District of Columbia; Senior Advisor in Psychiatry to the VA Hospital in the District; and consultant on neurology and psychiatry to the U.S. Public Health Service. Prior to his mandatory retirement in 1960 at the age of 65, the witness had also been Clinical Professor of Neurology at the George Washington Medical School; in World War II, he was Chief of Neuropsychiatry at several Army general hospitals in California with the rank of Lt. Colonel, at which time he was also president of boards handling administrative and disability discharges; and member of Army Disposition and Retiring Boards.
(b) Based on his examination of all the records and evidence pertaining to plaintiff, without, however, personally examining plaintiff, Dr. Shapiro testified, as follows:
Due to his arduous duties in combat areas and the stress he experienced, the plaintiff sustained a psychoneurosis in the service. The psychiatric condition was caused by the service and incapacitated plaintiff for active duty as a medical officer at the time of his release. His neurosis was evidenced by his multiple complaints and the absence of organic findings to account for them at the 235th Army Hospital and subsequent examinations. These included pains in the heart, *434 chest and other parts of his body, gastric symptoms, fatigue, aged and tense appearance, dyspnea (shortness of breath), migraine headaches and pruritus ani. His “physical inadequacy” was not due to premature senility, as found by the Disposition Board, since there were no organic symptoms of premature senility, but was due to his psychiatric condition, as his subsequent history clearly demonstrated. A significant sign of his psychiatric condition was the tremor revealed at his terminal examination. Plaintiff should then have had a psychiatric examination, but terminal physical examinations were generally inadequate during the World War II demobilization. The first neurological examination which was given plaintiff in 1949 clearly disclosed the tremors as a basis of his psychiatric condition. His incapacity for general service was recognized by the Disposition Board when it gave him a “3” or “C” profile but had it recognized the true nature and permanence of his psychiatric condition, plaintiff would have received a “4” (which would have disqualified him even for limited duty).
¡34. (a) Defendant presented as an expert witness Dr. Arthur Gregory Law, a psychiatrist, who is a Lt. Colonel in the Army Medical Corps and is presently the Chief of the Psychiatry and Neurology Out-Patient Service, Walter Reed Hospital, Washington, D.C. Upon completion in 1953 of his residency in psychiatry at the Walter Reed Hospital, he served as Assistant Chief of Psychiatry and Neurology Service at the 97th General Hospital where he served as president of the Medical Board on that Service. He also served on a Physical Review Council.
(b) While the testimony of plaintiff’s expert was based on his examination of all the records and evidence, Dr. Law’s testimony was based solely on his examination of plaintiff’s record of hospitalization at the 235th Army General Hospital from September 21, 1945 to October 7, 1945. See findings 7(a)-(g). Thus, his testimony was not based on any of the other Army medical records, such as the St. Victoret Dispensary record (see finding 7(a)), the terminal physical examination, or the 1948 examination. Nor was his testimony based on plaintiff’s subsequent history, including *435 the examinations and diagnoses of the Veterans Administration.
(o) Based solely on his examination of plaintiff’s record of hospitalization at the 235th Army General Hospital, without, however, personally examining plaintiff, Dr. Law testified as follows:
Under the profile system psychiatry is rated under “S” and there was no evidence in the record of hospitalization at the 235th General Hospital to place in question the “1” given plaintiff under “S”. The diagnosis of physical inadequacy due to premature senility was not a psychiatric diagnosis because premature senility is not a psychiatric but an organic condition. However, there were no organic symptoms to warrant this diagnosis. The symptoms recorded in the 235th General Hospital and subsequent records could represent a psychosomatic condition, and if such symptoms continued from 1946 and were subsequently diagnosed as psy-choneurotic, a profile of “1” for psychiatry would have been rather unlikely.
(d) Dr. Law was not asked to express an opinion as to the “3” or “C” profile or as to whether or not plaintiff was incapacitated for active service at the time of release.
35. Plaintiff’s witness, Dr. James M. McNulty, a surgeon, who had served as a medical officer in the Army and who had seen plaintiff many times from July 1948, testified that plaintiff, in 1948, was incapable of performing general field service and that if he had the same symptoms at the time of his release in 1946, he was not qualified for general service then. See finding 22 (c).
36. (a) Plaintiff’s witness, Dr. Joseph A. Dorgan, an orthopedic surgeon, who had examined plaintiff in May 1964, testified that on the 'basis of that examination, plaintiff’s history, and Army and VA medical records, plaintiff might well have a mixed type of arthritis: (1) degenerative, which is associated with age, although it does not afflict many persons from 40 to 50 years of age and can be caused by trauma, and (2) a rheumatoid type which is not associated with age but frequently with persons exposed to stress, strain and tension. He testified that if plaintiff’s arthritis was de *436 generative and. had pre-existed his entry into the service, it could well have been aggravated by his service. Considering only plaintiff’s history and Army records through 1945, he testified that he did not believe plaintiff’s arthritis was caused by his Army service, although such service could well have aggravated it.
(b) Dr. Dorgan’s final diagnosis, based on his examination of plaintiff in 1964, was that plaintiff had general osteoarthritis involving the lumbar spine and pelvis, both knees, and both ankles.
37. Defendant’s witness, Dr. William F. MacDonald, an oi*-thopedic surgeon and Lt. Colonel, Army Medical Corps, testified solely on the basis of plaintiff’s record of hospitalization at the 235th Army General Hospital during the period from September 21, 1945 to October 7, 1945. He testified that he found no error in the Army’s diagnosis at that time of osteoarthritis, chronic, mild, spine, cause undetermined, adding that, on the basis of such hospital records, he did not feel he had enough information to determine whether the diagnosis of osteoarthritis was correct or incorrect. He testified that an osteoarthritis that one doctor might classify as mild, another would describe as moderate; that a person with mild osteoarthritis would have relatively few complaints, perhaps only after prolonged exertion; and that an individual showing only minor changes on X-ray or examination might nevertheless be most uncomfortable. He testified that there is a mixed type of arthritis, i.e., a combination of osteoarthritis and rheumatoid arthritis.

Ultimate Finding

38. On the basis of the complete record, as well as on the basis of the record before the Correction Board, it is found that plaintiff was permanently incapacitated for active military service at the time of his release in 1946; that his incapacity and the cause of his incapacity were incidents of the service; that he was entitled to disability retirement pay from May 26,1946, the date of his release from active service; and that the decision of the Correction Board and the Secretary of the Army that plaintiff was not permanently *437 incapacitated for active military service at tbe time of his release was arbitrary, not supported by substantial evidence and contrary to Army regulations.
CONCLUSION’ OF LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the,,court concludes as a matter of law that plaintiff is entitled to recover disability retirement pay from the date of his release from active duty, less amounts received from the Veterans Administration, and judgment is entered to that effect.
The amount of recovery will be determined pursuant to rule 47(c).

The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

The diagnosis of physical Inadequacy due to premature senility and the absence of organic causes for plaintiff’s symptoms (excepting the arthritic symptoms) suggested a psychiatric condition. See note 11, infra. However, there were no psychiatric or neurological examinations of plaintiff prior to his release from the service.

 See findings 8-11 for a discussion of the Army physical profile serial system.

 Pruritus ani is an intense itching at the anus that is a symptom of various shin diseases and may occur idiopathieally as a neurosis. Dorland American Illustrated Medical JHationwy (22d ed.). In this latter connection, under the American Psychiatric Association classification, pruritus ani is given as a typical example of a psychological reaction representing the bodily reaction to emotion which is largely prevented from becoming conscious, that is to say, it is a physical manifestation of an emotional condition without there being actual organic physical disease. In plaintiff’s case it does not appear that the pruritus ani was due to an organic condition.

 During the 2-year period prior to 1942, when plaintiff was starting his medical practice, he had a total income of about $6,000 a year.

 A psychogenic somatization reaction is a term used in psychiatry for the conversion of mental experiences or states into bodily symptoms. Dorland American Illustrate & Medical Dictionary (22d ed.).

 The final VA neurological diagnosis based on the examination in 1950 was that plaintiff had a moderately severe degree of incapacity by reason of psychogenic somatization reaction, chronic, moderately severe, and that the external precipitating stress from combat was severe. The final VA neurological diagnosis based on the examination in 1954 was that plaintiff had an anxiety reaction ; chronic; moderately severe to severe; competent.

 In November 1956 plaintiff was admitted to a VA hospital where his chief complaint was shoulder, knee and finger pains. He was discharged 10 days later with a final diagnosis of osteoarthritis, treated, improved; and an undiagnosed disease of joints observed for rheumatoid arthritis, treated, improved.

 In explaining this full-duty standard, an Army representative testified before a House Armed Services Subcommittee in 1948 that the test was whether or not the officer was fit for full military duty in any place in the world at any time and under any conditions; that the defects that were disabling to the Army were such things as a heart condition, arthritis or stomach ailments which required the officer to watch what he did or the part of the country he went to; and that while the VA standard of disability was based on the effect on civilian life, the Army standard was based on ineffectiveness for military life, so that as an example, the Army “retire[s] a psychoneurotic * * *. [It] cannot use a psyehoneurotie officer” even though his disability under the VA is 10%. Hearings before the Legal Subcommittee of the Committee on Armed Services, U.S. House of Representatives, on Disability Retirement Systems in the Armed Services (80th Cong., 2d Sess., 1949), pp. 5, 6, 9, 283-84, 360. See also par. 50, AR 40-105, October 14, 1942 (finding 25(g)) ; Brown v. United States, 143 Ct. Cl. 605 (1958) ; Frederick v. United States, 150 Ct. Cl. 769, 280 F. 2d 844 (1960) ; Ludzinski v. United States, 154 Ct. Cl. 215 (1961) ; Woodard v. United States, 167 Ct. Cl. 306 (1964).

 Hearings before boards sueb as the Correction Board “are not contests; they are inquiries concerning disability. The purpose is to get at the truth of the matter * * * [and] [t]he medical history following the retirement will often be of great importance * * * [and] may * * * be highly pertinent to the inquiry.” Robertson v. Chambers, 341 U.S. 37, 39 (1951). See also Smith v. United States, 168 Ct. Cl. 545, 553 (1964).

 Some of these same deficiencies were apparent in the physical examination given plaintiff in the summer of 1948 at the Army station hospital.

 Premature senility is an organic and not a psychiatric condition and since there were no organic conditions to warrant this diagnosis, it is apparent that such diagnosis was incorrect.

 It is quite difficult to determine how much of plaintiff’s disability is referable to his psyehoneurosis and how much to osteoarthritis, as the symptoms of each disease could overlap.

 under the Army regulations, osteoarthritis, even in mild form, was cause for rejection of an application for a commission. See findings 25 (g) and (h). However, the physical standards for retention were not, under the regulations, to be as strictly interpreted as for appointment so that the nature and severity of such disease must be considered in order to determine eligibility for retirement for physical disability. See finding 25(f) ; Boraiko v. United States, supra, pp. 819-20 ; Towell v. United States, 150 Ct. Cl. 422, 434-36 (1960) ; Grubin v. United States, 166 Ct. Cl. 272, 279-80, 333 F. 2d 861, 864 (1964).

 The Army regulations then in effect (AK 40-1025, December 12, 1944) provided that a disease was presumed to have been incurred in the service, or if it pre-existed the service, was presumed to have been service aggravated. See e.g., Ludzinski v. United States, 154 Ct. Cl. 215, 266 (1961) ; Frederick v. United States, 150 Ct. Cl. 769, 771-72, 280 F. 2d 844, 845 (1960).

 This “Physical Profile Serial” regulation was applicable to enlisted men and not officers. However, it is relevant in explaining the meaning of the profile serial given to plaintiff on October 2, 1945, by the Disposition Board. See finding 8(a), supra.

 Par. 32(b) of AR 140-5 required that recommendations for promotion in the ORC were to “be accompanied by a report of physical examination * » * made within 1 year previous to the date of the recommendation.”

 It is found that both plaintiff and his 17116 were credible witnesses.

 Pruritus ani is an intense itching at the anus. It is a symptom of various shin diseases and may occur idiopathically as a neurosis. Dorland American Illustrated Medical Dictionary (22d ed.). In this latter connection, under the American Psychiatric Association classification, pruritus ani is given as a typical example of a psychological reaction representing the bodily reaction to emotion -which is largely prevented from becoming conscious, that is to say, it is a physical manifestation of an emotional condition without there being actual organic physical disease, gome years before plaintiff went into the service, he had pruritus ani caused by a fissure, which condition was cured at the time by treatment of the fissure. The pruritus ani that started in 1943 or 1944 does not appear to have been organic.

 A psychogenic somatization reaction is a term used in psychiatry for the conversion of mental experiences or states into bodily symptoms. Borland American Illustrated Medical Dictionary (22d ed.).

 Diagnostic Code No. 5003, which pertains to “Arthritis, hypertrophic, degenerative arthritis, or osteo-arthritis” reads as follows: “Rate on limitation of motion of Joints affected assuming minimum 10 per cent rating for each major Joint or group of minor Joints affected by bone changes, swelling, muscle spasm on motion, or pain objectively substantiated.”

 Diagnostic Code No. 9104 pertains to “Anxiety Hysteria” and reads as follows: “Rate as psychasthenia, substituting psychological reactions of fear, anxiety, etc. for phobias, obsessions or compulsions.” The 30% rating for his psychiatric disability meant that plaintiff’s condition was “moderately severe” in degree. “Moderately severe” is defined as a condition productive of considerable social and industrial inadaptability. See VA Schedule for Rating Disabilities (1945 ed.) pp. 130-33.

 Psychoneurosis is a broad term which includes somatization and anxiety reaction. Par. 52 of AR 40-105 (1942) describes psychoneurosis as anxiety, neurasthenia, psychasthenia, or hysteria.

 War Department Technical Manual TM 12-245, para. 23 and 60a. See also AR 605-110, December 28, 1938, par. 3; AR 605-10, C2, August 22, 1945, par. 22.

 TM 12-245, par. 23d. See also AR 605-250, March 28, 1944, par. 30(a).

 AR 605-250, par. 30(b) ; TM 12-245, pars. 23(d), 60a.

 TM 12-245, par. 60 (a) (2). See also AR 605-250, par. 37.

 See AR 140-5, June 17, 1941, pars. 10 and 57; AR 605-10, May 26, 1944, par. 20; WD Cir. 403, October 14, 1944, par. 2.